1  G. DALLAS HORTON
   Nevada Bar No. 005996
2  **G. DALLAS HORTON & ASSOCIATES**
   4435 S. Eastern Avenue
3  Las Vegas, NV 89119
   Phone: 702-380-3100
4  Fax: 702-385-3101

5  MICHAEL R. HALL
   Nevada Bar No. 005978
6  STEVEN T. JAFFE
   Nevada Bar No. 007035
7  JACOB S. SMITH
   Nevada Bar No. 010231
8  **Hall Jaffe & Clayton, LLP**
   7455 West Washington Ave., Suite 460
9  Las Vegas, Nevada 89128
   Phone: 702-316-4111
10 Fax: 702-316-4114

11 ROBERT D. VANNAH
   Nevada Bar No. 002503
12 MARK L. JACKSON
   Nevada Bar No. 010905
13 **VANNAH & VANNAH**
   400 S. 4th Street, 6th Floor
14 Las Vegas, NV 89101
   Phone: 702-369-4161
15 Fax: 702-369-0104

16 *Attorneys for Plaintiffs*

17              **UNITED STATES DISTRICT COURT**

18                  **DISTRICT OF NEVADA**

19 YVETTE WEINSTEIN, CHAPTER 7          CASE NO.: 2:10-cv-01551-PMP-PAL
   TRUSTEE OF THE ARIEL JAIME
20 BANKRUPTCY ESTATE.                   **OPPOSITION TO MORTGAGE CAPITAL**
   (Re: 8039 Anasazi Ranch Drive)       **ASSOCIATES, INC.'S MOTION TO**
21                                       **DISMISS PLAINTIFF'S COMPLAINT**
                                         **PURSUANT TO FRCP 12(b)(6)**
22                        Plaintiff,

23 vs

24 MORTGAGE CAPITAL ASSOCIATES, INC,
   Foreign Corporation; EMC MORTGAGE
25 CORPORATION, Foreign Corporation; BAC
   HOME LOANS SERVICING, LP, Foreign
26 Limited Partnership; ROE Rating Company;
   DOES 1- 100, inclusive; ROE ENTITIES 1-100;
27 ROE CORPORATIONS 1 - 100, inclusive.

28                        Defendants

COMES NOW, Plaintiff YVETTE WEINSTEIN, CHAPTER 7 TRUSTEE OF THE ARIEL JAIME BANKRUPTCY ESTATE,, by and through her attorneys MICHAEL R. HALL, ESQ., STEVEN T. JAFFE, ESQ., and JACOB S. SMITH, ESQ. of the law firm of HALL, JAFFE & CLAYTON, LLP, and G. DALLAS HORTON, ESQ. of the law firm of G. DALLAS HORTON & ASSOCIATES, and ROBERT D. VANNAH, ESQ., and MARK L. JACKSON, ESQ. of the law firm of VANNAH & VANNAH, hereby files her Opposition to Defendant Mortgage Capital Associates, Inc.'s Motion to Dismiss.

This Opposition is made and based upon the pleading and papers on file herein, the affidavits and exhibits attached hereto, and any oral argument that may be presented at the time of the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The facts of this matter present the quintessential case for predatory lending. While predatory lending practices are not easily defined, they are most clearly made manifest in transactions wherein certain parties—*e.g.*, home sellers, mortgage brokers, lenders, loan servicers, etc.—take advantage of informational asymmetries in order to reap above market profits at the expense of the borrower and society as a whole. These information asymmetries, however, are not a function of the expertise, hard work, or ingenuity of these parties; rather, they are a function of the disproportionate bargaining power that exists between subprime borrowers and subprime lenders. Transactions falling under the umbrella of predatory lending are as varied and diverse as the financial instruments that are concocted in the imaginations of subprime lenders. It is generally true, however, that subprime lenders implement predatory lending practices with the greatest frequency against minorities and the poor.

In this case, Defendant Mortgage Capital Associates, Inc. (hereinafter "Mortgage Capital") would have this Court believe that it played absolutely no role with regard to the predatory lending tactics that were used against Plaintiff Ariel Jaime (hereinafter "Mr. Jaime"). Granted, Mortgage Capital's misconduct may not fit "neatly" within certain remedies currently provided by the statutory and common law; however, Mortgage Capital's business practices, along with the business practices of other subprime lenders, created a system in which Mortgage Capital was able to extract profits in excess of

1  what the market would normally bear by making a "gamble" on the continued appreciation of the
2  housing market, a gamble which was never disclosed to Mr. Jaime or other subprime borrowers. This
3  gamble has led to the most disastrous financial meltdown of the American economy since the Great
4  Depression. In the aftermath of what has been called the "Great Recession," courts and legislatures have
5  been struggling with deciding who should bear the blame, along with its consequences, for the lending
6  practices which in hindsight seem so utterly ridiculous.

7         More than three years after the housing market crash of 2007, much has changed in terms of the
8  statutory remedies available to the victims of predatory lending practices. *See, e.g.,* NRS 598D.100
9  (amending the 2003 version of the statute to include clearer language regarding the illegality of making
10  loans without verifying the borrower's ability to repay). However, the courts have been slow to provide
11  relief to borrowers under common law causes of action such as fraud, negligence, and civil conspiracy.
12  Commentators have argued that the courts' reluctance to provide relief under the common law is not so
13  much a function of the lack of merit of the predatory lending cases being brought before the bar, but
14  rather that the common law has not sufficiently evolved to handle the unique misconduct perpetrated by
15  predatory lenders. *See* Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and*
16  *Economics of Predatory Lending*, 80 Tex. L. Rev. 1255, 1298 (2002). Thus, aggrieved borrowers have
17  been left scrambling as they try to seek retribution through a patchwork of common law causes of action
18  for the indisputably dishonest and reckless acts committed by predatory lenders which caused subprime
19  borrowers substantial personal and economic harm. Moreover, borrowers are left in an even more
20  precarious position given that in many instances the lenders, brokers, and servicers have almost
21  exclusive control over the evidence that borrowers would need to even overcome a motion to dismiss
22  brought under Fed. R. Civ. P. 12(b)(6).

23         While Mortgage Capital would have this Court believe it was simply an innocent bystander
24  which is far removed from any misconduct perpetrated by the mortgage broker, such is not truly the case.
25  As will be explained below, Mortgage Capital funded Mr. Jaime's loans for which it knew, or should
26  have known, that the financial information contained on the loan application and other mortgage
27  documents was falsified by the mortgage broker. Alternatively, if it is shown that the loan application
28  documents accurately reflected Mr. Jaime's financial status, Mortgage Capital had no reasonable basis

1    for funding Mr. Jaime's loans given his economic situation at the time. In short, Mortgage Capital

2    colluded with the other Defendants in this case to fund Mr. Jaime's loans in order to later sell the loans

3    for a profit to BAC, of which loans it knew, or should have known, Mr. Jaime could not afford, while

4    communicating to him, either expressly or impliedly,  that the mortgage fit within his budget.

5    Accordingly, Mortgage Capital should not be allowed to escape justice through a motion to dismiss.

6    **II.**      **STATEMENT OF FACTS AND PROCEDURAL HISTORY**

7         **A.  Relevant Facts.**

8         On or about December 29, 2006, Ariel Jaime ("Mr. Jaime" or "Debtor") purchased real

9    property located at 8039 Anasazi Ranch Avenue, Las Vegas, Nevada 89131, also known by Clark

10   County Assessor Parcel number 125-21-211-035, (hereinafter "The Property"). *See* Clark Country

11   Recorder's Office Property Records, attached hereto as **Exhibit "1"**.  Mr. Jaime received financing for

12   the purchase of the Anasazi Property from Defendant Mortgage Capital Associates, Inc  ("Mortgage

13   Capital").

14         Prior to his purchase of the Anasazi Property, Mr. Jaime was living in Valencia, California,

15   where he owned a home. *See* Affidavit of Ariel Jaime (hereinafter *Aff. of Jaime*), at ¶ 2. Additionally, a

16   short time before he moved to Las Vegas he purchased a home located at 8528 Caladium Court, Las

17   Vegas, Nevada, 89149, also known by Clark County Assessor Parcel number 125-20-712-011, for his

18   sister with the agreement that she would make the mortgage payments. *Id.* at ¶ 1.

19         Sometime prior to December of 2006, Mr. Jaime received a job offer in Las Vegas as a

20   Spanish-English translator. *Id.* at ¶ 3. Mr. Jaime accepted the job and subsequently entered into the

21   contract to purchase the Anasazi Property. *Id.* at ¶ 5. He tried to sell his home in Valencia, but was

22   unable to do so; however, he was able to rent the home which allowed him to cover the costs of the

23   home's mortgage. *Id.* at ¶ 4.

24         At the time Mr. Jaime purchased the Anasazi Property, he was only making $3,500.00 a month.

25   *Id.* at ¶ 5. Mr. Jaime met with someone regarding the purchase of the property, but he is currently unable

26   to determine exactly with whom he dealt with in securing financing for the purchase of the Anasazi

27

28

1  Property. *Id.* at ¶ 6.[1] Regardless, the broker/lender was not concerned that Mr. Jaime mad only $3,500.00

2  a month and already owned two other mortage-encumbered properties. *Id.* at ¶ 11. The broker/lender

3  filled out the loan application for Mr. Jaime, and then had Mr. Jaime simply sign the documents once

4  they were complete. *Id.* Mr. Jaime was approved by Mortgage Capital to finance the full purchase price

5  of the Anasazi Property with no further inquiry being made into Mr. Jaime's ability to repay the loans.

6  *Id.*

7        The Total purchase price for the Property was $362,803.00, the full amount of which was

8  borrowed from Mortgage Capital. *See* First and Second Notes, attached hereto as **Exhibits "2" and "3"**,

9  respectively. The borrowed amount was spread over two (2) separate mortgages, the first mortgage

10  ("First Mortgage") in the amount of $290,242.00 with an initial interest rate of 1.00%. The First

11  Mortgage was structured as an adjustable-rate, interest only loan arm, with an initial monthly payment of

12  $933.53. After two months, the rate would adjust by adding 3.125 percentage points to the current index

13  rate, meaning Plaintiff's interest rate on the principal could have reached as high as 9.950%. The rate

14  would adjust every month for the remainder of the loan. *See* **Exhibit "2".** In light of the fact that the

15  total amount owed on the loan would increase as the interest rate increased, provisions in the First

16  Mortgage capped the monthly payment to increase by 7.5% in February 2008, and by 7.5% on February

17  1 of each year thereafter. Thus, not only would Mr. Jaime's monthly payment increase, by it would

18  increase to an amount below what would be required to actually reduce the total amount owed on the

19  loan, which would make the loan a negative amortization mortgage. In other words, Mr. Jaime's

20  required payments were not even paying the interest on the loan, and the remaining unpaid interest was

21  being added to the principal loan amount. *Id.*

22        In addition to the negative amortization provisions of the First Mortgage, the loan also included

23  a prepayment penalty if Mr. Jaime were to prepay sooner than one year after the loan was closed. *Id.* The

24  effect of such prepayment penalties is to "strip" the equity out of the house and allocate it to the lender.

25  *See* Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of*

26  *Predatory Lending*, 80 Tex. L. Rev. 1255, 1263 (2002) (explaining the relationship between prepayment

27

28      [1] It is assumed that a mortgage broker referred Mr. Jaime to Mortgage Capital as the lender, but it is even possible that Mortgage Capital acted as the broker itself.

1 penalties and equity stripping).

2       The second mortgage ("Second Mortgage" or "Second") was for 36,280.00 at a rate of 9.00%,

3 requiring a monthly payment of $291.92. *See* **Exhibit "3".** The second would require a balloon

4 payment of the remaining unpaid balance after 15 years. *Id.*

5       Throughout the lending process, several misstatements, deficiencies, misrepresentations, and

6 other fraudulent, misleading, and deceptive practices were employed by the broker and Mortgage Capital

7 Associates, Inc, (and later ratified by BAC). Specifically, Mr. Jaime was repeatedly told that he could

8 afford the payments under the terms of the First and Second Mortgages on the Anasazi Property based

9 upon his income alone. It was never explained to him that Mortgage Capital's sole justification for

10 lending him the funds to purchase the house was Mortgage Capital's calculated gamble that the home

11 would quickly appreciate in value, which would have enabled Mr. Jaime to refinance or sell the home.

12 Despite having never revealed this gamble to Mr. Jaime, the loans were processed, approved, and

13 funded, and the Deeds of Trust were recorded. Defendant Mortgage Capital subsequently sold the loans

14 to Defendant BAC, who serviced the loans, and ultimately foreclosed on loans that should never have

15 been issued in the first place.

16       After managing the mortgage payments for over two years, Mr. Jaime could no longer afford

17 the payments and fell behind. *Aff. of Jaime* at ¶ 12. On August 14, 2009, a Default was recorded by

18 Defendants, and on August 13, 2010, a Notice of Trustee sale was recorded on the property. **Exhibit**

19 **"1"**.

20       **B.  Relevant Procedural History**

21       On or about August 16, 2010, Plaintiff filed her Complaint in the Eighth Judicial District Court

22 of Clark County, Nevada, Case No. A610034 asserting causes of action against Defendants for breach of

23 contract, breach of contractual covenant of good faith, violation of NRS 598D Prohibiting Unfair

24 Lending Practices, violation of the consumer fraud statute under NRS 41.600, violation of NRS 598

25 prohibiting deceptive trade practices, fraud, constructive fraud, negligent misrepresentation, negligence,

26 tortious interference with contract, and civil conspiracy.

27       Plaintiff also wishes to name the broker involved with the Loans, but currently possesses

28 extremely limited documentation with regard to the Loans. Specifically, Plaintiff is not in possession of

1  any of the closing documents including the Uniform Residential Loan Application, which would reveal

2  the name of the company and person who brokered the loans. In fact, it is possible that Mortgage Capital

3  acted as the mortgage broker with respect to Mr. Jaime's purchase of the Anasazi Property.

4       On September 11, 2010, BAC filed its Petition for Removal, based upon federal question

5  jurisdiction this Court has over the Truth in Lending Act ("TILA"), the Real Estate Settlement

6  Procedures Act ("RESPA"), and the Fair Credit Reporting Act ("FCRA"). Defendant also based its

7  removal on diversity jurisdiction. On September 30, 2010, Mortgage Capital filed its motion to dismiss

8  pursuant to Fed. R. Civ. P. 12(b)(6). This opposition to the motion to dismiss now follows.

9  **III.  ARGUMENT**

10       **A.  Standard of Review**

11       Plaintiff first notes the well-settled and oft-repeated bedrock principle of Nevada jurisprudence

12  that Courts favor resolving cases on their merits rather than through procedural technicalities. *Hotel*

13  *Last Frontier v. Frontier*, 79 Nev. 150, 155, 380 P.2d 293 (1963); *see also Hansen v. Universal Health*

14  *Services, Inc.*, 112 Nev. 1245, 1248; 924 P.2d. 1345 (1996); *Price v. Dunn*, 106 Nev. 100, 105, 787 P.2d

15  785, 787 (1990).

16       In *Hotel Last Frontier v. Frontier*, the Nevada Supreme Court reversed the denial of a lessor's

17  motion to set aside a default judgment that had been granted. *Hotel Last Frontier v. Frontier*, 79 Nev.

18  150, 155, 380 P.2d 293 (1963). The court reasoned that because there was no bad faith, and because the

19  lessor had a meritorious defense, the default judgment should be overturned. In doing so, the Court

20  explicitly acknowledged a "basic underlying policy to have each case decided upon its merits," holding

21  that "in the normal course of events, justice is best served by such a policy." *Id.*

22       Accordingly, if this Court were to grant the instant Motion, Plaintiffs would be denied justice,

23  as they would lose any and all opportunity to have their case tried on the merits. Justice is best served by

24  determining actions on their merits.

25       A complaint can be dismissed under Fed. R. Civ. P. 12(b)(6) only if it appears beyond doubt

26  that the plaintiff can prove no set of facts in support of a claim which would entitle plaintiff to relief.

27  *Brennan v. Straub,* 246 F. Supp. 2d 360 (S.D. N.Y. 2003). Further, a complaint need not contain direct

28  allegations on every material point to sustain recovery, but may contain allegations from which inference

1  fairly may be drawn that evidence on the material points will be introduced at trial. *Graves v. Tubb* 281

2  F.Supp. 2d 886 (N.D. Miss. 2003).

3        A two-step approach should be applied when considering motions to dismiss. *Ashcroft v. Iqbal*,

4  129 S.Ct. 1937, 1950 (2009). First, the court must accept as true all factual allegations in the complaint,

5  and second, the court must consider whether the factual allegations in the complaint allege a plausible

6  claim for relief. *Id.* at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that

7  allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct."

8  *Id.* at 1949.

9        In applying this standard of review to the matter at hand, it is apparent that Plaintiff's

10  Complaint alleges facts which are sufficient to support the causes of action set forth.  While Mortgage

11  Capital may take issue with the layout or format of the Complaint, such does not merit a dismissal where

12  valid factual and legal assertions exist.

13        **B.  Defendant's Motion to Dismiss is Premature And Should Not Be Decided Until This
            Court Has Determined Whether Removal Was Appropriate.**

14

15        United States Code §1447 (2008) entitle, "Procedure After Removal Generally," provides

16            A motion to remand a case on the basis of any defect other than lack of subject matter
            jurisdiction must be made within 30 days after the filing of the notice of removal under
            section 1446(a). **If at any time before final judgment it appears that the district court**

17            **lacks subject matter jurisdiction**, the case shall be remanded.

18  28 U.S.C. §1447(c) (2008)(emphasis added). Defendant BAC filed its Petition for Removal on

19  September 11, 2010, based upon subject matter jurisdiction. More specifically, Defendant BAC has

20  removed this action from the Eighth Judicial District Court of Nevada to this Court on the basis that

21  Plaintiff's causes of action turn on the construction of federal statutes, namely the federal Truth in

22  Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA").

23        On October 8, 2010, Plaintiff filed a Motion for Remand asserting, among other things, an

24  absence of federal question jurisdiction. Plaintiff's Motion for Remand sets forth the reasoning for

25  remanding this matter to the state court in which it was originally filed. It stands to reason that this Court

26  must determine whether or not it has proper jurisdiction over this matter before ruling on a dispositive

27  motion, a ruling which could potentially prove fatal to one or more of Plaintiff's claims against

28  Defendants.

**C.  Plaintiff Stipulates that the Tortious Interference with Contract (9th CFR) Should Be Dismissed as to Defendants.**

The cause of action for tortious interference with contract should be dismissed as to Defendant Mortgage Capital, and Plaintiff so stipulates.

**D.  The Remaining Claims Against Mortgage Capital Cannot be Dismissed Because They are Pleaded with sufficient Specificity and Legal Basis.**

Despite its dismay at being included as a Defendant in this matter and its insistence that Mr. Jaime was the only party to have breached an agreement, Mortgage Capital is not simply the innocent bystander it claims to be. In reality, Mortgage Capital, as lender of the loans, had a legal obligation to verify the veracity of the information provided on the loan application and other documentation submitted to secure the loans. Mortgage Capital argues that the claims against it should be dismissed because it did not directly communicate with Plaintiff during the loan application process or at closing. At this time, unfortunately, Plaintiff is without the sufficient documentation to repudiate this claim given the lack of information currently available to Plaintiff. However, during the loan application process, it was never explained to Mr. Jaime which entities the brokers/loan officers represented. *Aff. of Jaime* at ¶ 6. It could very well be that Mr. Jaime dealt directly with Mortgage Capital in obtaining financing for the purchase of the Anasazi Property. Notwithstanding the uncertainty surrounding Mortgage Capital's level of involvement with Mr. Jaime during the loan application process, Mortgage Capital participated in a well-choreographed scheme designed to strip the equity, or at least the equity Mortgage Capital speculated would quickly accrue, out of the Anasazi Property by using usurious loan terms which were never explained to Mr. Jaime.

Even if Mortgage Capital had no direct involvement with Mr. Jaime during the loan origination process, Mortgage Capital's reliance on the loan application documents and the subsequent decision to fund the loans is completely unreasonable regardless of whether the loan application contained misrepresentations perpetrated by the broker/loan officer regarding Mr. Jaime's income, or even if the loan application accurately reflected Mr. Jaime's financial status. At this time, Plaintiff is without the loan application documents and, therefore, cannot precisely determine what information Mortgage Capital relied upon in making the decision to finance the purchase of the Anasazi Property. However, there are two likely scenarios in this case regarding the loan application, both of which inculpate

Mortgage Capital: (1) Mortgage Capital was not justified in approving Mr. Jaime's loans as the loan application documents contained various misstatements of fact not authorized by Mr. Jaime, including alterations to Mr. Jaime's monthly income and property ownership record; or (2) the loan application documents accurately reflected Mr. Jaime's income and property ownership record, and, as such, Mortgage Capital had no reasonable basis to fund a loans for $362,803.00 given the Mr. Jaime made only $3,500.00 a month and already owned two other mortgage-encumbered properties.

As a result of Mortgage Capital's position as the lender, and its failure to investigate into the ability of Mr. Jaime to repay the loans, Mortgage Capital should be held liable for the damages ultimately incurred by Mr. Jaime. Defendant's Motion to Dismiss asserts that each of Mr. Jaime's causes of action amount to nothing more than "vague claims" that lack the necessary factual specificity to support the claims. *See* Mortgage Capital's Motion to Dismiss [Dkt. 14], at p. 3-7. On the contrary, each of Mr. Jaime's causes of action contain the specificity and legal basis necessary to survive this Motion to Dismiss, even despite the limited documentation which Mr. Jaime possesses regarding the purchase of the Anasazi Property.

The factual allegations asserted against Mortgage Capital in Plaintiff's Compliant more than "plausibly give rise to an entitlement of relief." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940-41 (2009). As stated above, Mortgage Capital either funded loans which it knew Mr. Jaime could not afford, or, alternatively, Mortgage Capital funded loans based upon fraudulent loan application documents of whose veracity Mortgage Capital intentionally failed to confirm. As a result of Capital Mortgage's intentional and/or reckless business practices, Mr. Jaime was conned into entering a transaction which he could have only afforded if the Anasazi Property had rapidly appreciated in value. Predatory lenders, like Mortgage Capital, should be held liable for the undisclosed gambles they made using borrowers' homes as collateral.

Plaintiff has pled sufficient facts so as to place all Defendants, including Mortgage Capital on notice of the claims asserted. Plaintiff pled numerous facts throughout his Complaint which set forth and support each claim asserted against each Defendant, including Capital Mortgage. Furthermore, the facts of this case show that Mortgage Capital had no reasonable justification to make the loans to Mr. Jaime if the lending decision had been based solely on Mr. Jaime's ability to repay the loans. Accordingly,

1    Plaintiff respectfully requests this Court deny Countrywide's Motion in its entirety.

2                    **1.    Unfair Lending Practices Claim**

3              Defendant argues that Plaintiff's claim for unfairn lending practices under NRS 598D should

4    be dismissed because the 2007 version of NRS 598D did not apply to this particular transaction, but

5    rather the 2003 version should be applied. Nevertheless, the legislative history and minutes from the

6    hearings regarding the drafting of the original 2003 version of NRS 598D suggest that subprime lenders,

7    owe a duty of care to borrowers. For example, in the April 2, 2003 Assembly Committee on Commerce

8    and Labor meeting, the committee discussed the predatory lending situation and how to draft NRS 598D

9    in order to prevent some of these practices. During that meeting, Mr. Ken Scruggs, of the Household

10   Financial Group, stated that "it is felt that it is proper public policy to place special regulations on

11   subprime lenders to ensure that their borrowers are given a fair shake, that they understand what is going

12   on in the transaction, and that they are fully and properly disclosed to." *See* Excerpts from Committee

13   Meeting Minutes of April 2, 2003, attached hereto as **Exhibit "4."**[2]  Mr. Scruggs further stated: "I

14   believe that the bill takes the approach that the person that actually makes the loan is responsible to see

15   that the customer is given everything that he needs to have before the loan is closed. As it is currently

16   written, it would also apply to whoever ultimately holds the note if the loan is sold out." *Id.* at p.8

17   (emphasis added).

18              Additionally, Assembly Bill 284, § 7(b), *i.e.*, the 2003 version of NRS 598D.100(b), provides:

19                    It is an unfair lending practice for a lender to:

20                    [. . .]

21                    (b) knowingly or intentionally make a home loan to a borrower based solely
                     upon the equity of the borrower in the home property and ***without***
22                    ***determining that the borrower has the ability to repay the loan from other***
                     ***assets, including, without limitation, income.***
23

24   *Id.* (emphasis added). The language of the bill, as well as the legislative history, shows a clear intent that

25   lenders be required to base lending decisions not on the value or projected value of the property, but

     rather that lending decisions be based strictly on the personal risk profile of the borrower. Here,
26

27   _____

28        [2]        The committee meeting minutes can be found at http://search.legstate.nv.us/isysquery/9e9b4108-860
     3-4832-8637-26419f9e597e/3/doc/2339.html.

1   Mortgage Capital  made the loans to Plaintiff based entirely on Mortgage Capital's "prediction" that

2   housing prices in Las Vegas would continue to sky rocket as they had over the past decade. The decision

3   was not based upon Mr. Jaime's ability to repay the loan, nor could it have been since Mr. Jaime was in

4   no position to take on a $362,803.00 mortgage with a monthly income of only $3,500.00. Moreover,

5   Mortgage Capital never disclosed to Plaintiff that the entire basis for extending the loans to him on such

6   ridiculous terms was based upon Mortgage Capital's gamble regarding the speculative future equity that

7   Plaintiff would have in his home. Mortgage Capital, and the other defendants, simply led Plaintiff to

8   believe that he could afford the loan, even though that could only be true if Plaintiff's home rapidly

9   appreciated in value. Thus, even if the 2007 version of NRS 598D does not apply in this case, Mortgage

10   Capital is still in violation of the 2003 version of the statute. Therefore, Plaintiff's claim for relief under

11   NRS 598D should not be dismissed.

12         Further, Mortgage Capital argues that NRS 598D does not apply in this case because the statute

13   only applies to high risk mortgages as defined under the Home Ownership and Equity Protection Act

14   ("HOEPA"), and, they argue, Plaintiff "does not allege that [his] loan meets this requirement because

15   [he] cannot." Mortgage Capital's Motion to Dismiss [Dkt. 14], at p. 9. Mortgage Capital's conclusory

16   statement may or may not be true; however, acceptance of Defendants' argument by the Court would

17   place the burden of a pleading standard on Plaintiff even beyond what is required under Fed. R. Civ. P.

18   9(b). Essentially, Defendant is arguing that Plaintiff is required, at this early stage in the case, to prove

19   that the mortgage is a high-risk mortgage under HOEPA. While Plaintiff does intend to prove this at the

20   appropriate time, Defendant's demand does not comport with the federal court's notice pleading

21   standard. Based upon the above, it is clear that Plaintiff has sufficiently pled his case to put Mortgage

22   Capital on notice that it violated NRS 598D and, therefore, that claim for relief should not be dismissed.

23                    **2.     Civil Conspiracy Claim**

24         Civil conspiracy is an actionable claim recognized by Nevada Courts. *See Jordan v. State,* 121

25   Nev. 44, 74-75, 110 P.3d 30, 51 (2005). In *Hotel Riviera, Inc. v. Short*, the Nevada Supreme Court held

26   that "an act lawful in an individual may be the subject of civil conspiracy when done in concert,

27   provided it is done with a direct intention to injure another, or when, although done to benefit the

28   conspirators, its natural and necessary consequences is the prejudice of the public or the oppression of

1  individuals." 80 Nev. 505, 512, 396 P.2d 855, 859-860 (1964) (quoting *FTC v. Raymand Bros.-Clark*
2  *Co.*, 263 U.S. 565, 574 (1924)). A claim of conspiracy-to-defraud requires the following elements: (1) a
3  conspiratorial agreement, (2) an overt act in furtherance of the conspiracy, and (3) resulting damage to
4  the plaintiff. *See Jordan*, 121 Nev. at 74-75, 110 P.3d at 51. It is generally recognized that the conspiracy
5  agreement need not extend to all details of the conspiratorial scheme, and the conspiratorial agreement
6  may be implied from the conduct of the conspirators. *See Lee v. State Farm Mut. Auto. Ins. Co.*, 249
7  F.R.D. 662, 681 (D. Colo. 2008); *Collyer v. Darling*, 98 F.3d 211, 230 (6th Cir. 1996); *Dalle v. Thomas*
8  *H. Temple Co.*, 186 Tenn. 69, 90, 208 S.W.2d 344, 353 (Tenn. 1948).

9        Conspirators may be responsible for a co-conspirator's conduct in furtherance of the alleged
10 conspiracy, even if they have not dealt directly with the injured party. *See Bodner v. Banque Paribas*,
11 114 F. Supp. 2d 117, 125 (E.D. N.Y. 2000). A conspiracy claim serves to expand liability for the
12 underlying wrong to persons who are not directly involved in the wrongful actions, and includes those
13 who merely plan, assist or encourage the wrongdoer's acts, or who supervise or profit from the tortious
14 conduct. *See generally Plascencia v. Lending 1st Mortgage*, 583 F.Supp.2d 1090, 1100 (N.D. Cal. 2008)
15 ("It does not matter that the original transaction was not between [the borrower] and [the subsequent
16 purchaser/servicer], because by purchasing the loan, [the subsequent purchaser/servicer] subjected itself
17 to potential liability for its role in the alleged fraudulent scheme."); *Time Warner Entertainment v.*
18 *Worldwide Electronics*, 50 F. Supp. 2d 1288 (S.D. Fla. 1999); *Nance v. Maxwell Fed. Credit Union*, 186
19 F.3d 1338 (11th Cir. 1999); *Sain v. Nagel*, 997 F. Supp. 1002 (N.D. Ill. 1998); *Tompkins v. Cyr*, 995 F.
20 Supp. 664 (N.D. Tex. 1998). For liability to attach, the unlawful acts of the co-conspirators must have
21 been foreseeable. *Williams v. Fedor*, 69 F. Supp.2d 649, 666 (M.D. Pa. 1999), *aff'd*, 211 F.3d 1263 (3d
22 Cir. 2000).

23       In *Plascencia*, borrowers were unaware that their loan was subject to negative amortization.
24 583 F.Supp.2d at 1093–94. They brought action against the lender and the purchaser of their mortgage
25 citing violations of the TILA as well as violations of California's statutory and common law in
26
27
28

             13

1  connection with the sale of certain residential mortgage products. *Id.*[3]

2      The mortgage purchaser brought a motion to dismiss all causes of action, including the claim

3  for violations of California's unfair competition laws (UCL). *Id.* The court held that the claim should not

4  be dismissed, because, by showing that the subsequent mortgage purchaser purchased the original

5  lender's mortgage with knowledge of the lender's TILA violations, the plaintiffs could establish a

6  collusive agreement between the defendants:

7          Plaintiffs may be able to establish that [the subsequent purchaser] gave [the original
           lender] a financial incentive to continue to commit those violations, and therefore
8          may be subjected to liability for aiding and abetting violations of the [California
           Statute]. Moreover, [the subsequent mortgage purchaser]'s profiting from loans
9          featuring oppressive terms that were not fully disclosed in compliance with TILA
           could itself be an unfair business practice under the UCL.

10  *Plascencia*, 583 F. Supp. 2d at 1098.

11      *Plascencia* stands for the general idea that all parties in the mortgage chain, be they brokers,

12  lenders, or servicers are liable for the statutory violations and intentional torts committed in furtherance

13  of a conspiratorial scheme by any one of the parties in that chain. In this case, it is not clear at this point

14  whether Mortgage Capital acted as a broker to Mr. Jaime or just as a lender. Regardless, the persons with

15  whom Mr. Jaime dealt in purchasing the Anasazi Property made repeated representations that Mr. Jaime

16  would be able to afford the house and that he would be able to refinance the home within a short time.

17  Mr. Jaime was never told that the approval of his loans was based entirely on Mortgage Capital's wager

18  that his home would rapidly appreciate in value. As discussed more fully below, these

19  misrepresentations and omissions, regardless of who perpetrated them, form the basis for Plaintiff's

20  various claims which extend to Mortgage Capital as a co-conspirator regardless of whether Mortgage

21  Capital's role was limited to only that of a lender. As has previously been mentioned, Plaintiff will be

22  able to provide more specificity with regard to the civil conspiracy claim as more information becomes

23  available through discovery.

24      In this case, Plaintiff has sufficiently pled the elements of a civil conspiracy claim against

25

26

27  [3] It should be noted that the fact that plaintiffs relied on TILA as the basis for imposing a legal duty on the
   subsequent purchaser/servicer did not serve to preempt the state law claims. In fact, the court specifically rejected such
   arguments made by the defendants. *Plascencia*, 583 F. Supp. 2d at 1100 ("Although [the subsequent purchaser/servicer]
28  argues that this duty cannot serve as the basis for a common law fraud claim because such a claim would be preempted, the
   Court has already rejected this theory of preemption.")

Mortgage Capital. First, the Complaint adequately alleges that Mortgage Capital either expressly, or impliedly through its conduct, agreed to conspire with the other Defendants. *See* Complaint [Dkt. 1] at ¶¶ 50–59, 139–48. Second, Mortgage Capital committed an overt act by funding Plaintiff's loans which it knew or should have known was the product of the fraudulent and illegal conduct, or, at the very least, Mortgage Capital knew or should have known that Mr. Jaime could not repay the loan unless the home appreciated rapidly in value. *Id.* Third, Plaintiff adequately alleges that he has suffered damages as a result of this conspiratorial scheme (*e.g.,* loss of their home, damage to their credit, etc.). *Id.* at ¶¶ 59, 139-48.

Mortgage Capital, as a broker/lender of subprime mortgages, was engaged in an ongoing conspiratorial scheme against homeowners just like Mr. Jaime. Mortgage Capital's actions on their face might appear to be legal; however, as *Hotel Riviera, Inc. v. Short* instructs, an otherwise lawful action taken by an individual becomes unlawful when its natural and necessary consequence results in the oppression of the public and individuals like Mr. Jaime. 80 Nev. at 512, 396 P.2d at 859-60. The conspiracy between Mortgage Capital and the other Defendants existed well before the closing on Mr. Jaime's predatorily procured mortgage was finalized. Mortgage Capital benefitted from this conspiracy. Mortgage Capital benefitted by reaping short term profits made by gambling on assumptions regarding the housing market that were never disclosed to Plaintiff.

The law requires that all Defendants be held accountable for all foreseeable unlawful acts made in furtherance of this conspiracy. Thus, Mortgage Capital is liable for all claims regarding fraud, constructive fraud, consumer fraud, deceptive trade practices, and violations of NRS 598D with contract regardless of whether it had any direct involvement with Plaintiff before or at closing. Plaintiff's Complaint sufficiently alleges Mortgage Capital's involvement in the conspiracy, and the involvement of all Defendants in the underlying unlawful activities giving rise to the conspiracy. Mortgage Capital's Motion to Dismiss should be denied.

### 3.    Consumer Fraud and Deceptive Trade Practices Claim

Nevada Revised Statute 598.0915 provides, in pertinent part:

> A person engages in a "deceptive trade practice" if, in the course of his business or occupation, he:

[...]

15. Knowingly makes any other false representation in a transaction.

NRS 598.0915 (2010). As discussed above, the parties who dealt with Mr. Jaime in closing on the purchase of the Anasazi Property made several misrepresentations regarding the terms of the loans and also regarding Mr. Jaime's ability to repay the loans. These false representations clearly fall under the plain and unambiguous language of NRS 598.0915(15).

Further, Defendant argues that Plaintiff's claim for deceptive trade practices fails because NRS 598.0915 does not apply to real estate transactions, and it is not pleaded with sufficient particularity to meet the heightened standard required for claims of fraud. *See* Mortgage Capital's Motion to Dismiss [Dkt. 14], at p. 11. Nevertheless, Mortgage Capital's argument falls flat as the Supreme Court of Nevada has recently held that NRS 598.0915(15) does in fact apply to transactions involving real estate, and that a heightened pleading standard should not be applied to claims made under the statute. *Betsinger v. D.R. Horton*, 126 Nev. 17, 232 P.3d 433 (2010) (citing *Mack v. Ashlock*, 112 Nev. 1062, 1066, 921 P.2d 1258, 1261 (1996)).

In *Betsinger*, the plaintiff, Betsinger, was quoted an agreeable interest rate by a builder's lending division and, based upon the quoted rate, contracted to purchase a house with the builder. *Id.* at __, 232 P.3d at 435. After placing down an earnest money deposit on the property, the lender notified Betsinger that the rate would actually be nearly two full percentage points higher than was initially represented. *Id.* Plaintiff rescinded the contract and sought a refund of his earnest money deposit, which the lender refused to give. *Id.* At trial, a jury returned a verdict finding that the lender had engaged in deceptive trade practices, and awarded compensatory, actual, and punitive damages. *Id.*

On appeal, the Supreme Court of Nevada held that the burden of proof for deceptive trade practices was merely that of a preponderance of the evidence. In so holding, the court stated that the mere use of the word fraud does not create a higher standard:

> [T]he mere fact that the word 'fraud' appears in the [. . .] consumer
> protection statute does not give rise to an inference that the legislature
> intended to require a higher degree of proof than that ordinarily required in
> civil cases. [. . . .] [T]he purpose of the consumer protection statute [is] to
> provide consumers with a cause of action that [is] easier to establish than
> common law fraud, and therefore, statutory fraud must only be proven by a
> preponderance of the evidence. Statutory offenses that sound in fraud are

16

1

2

> separate and distinct from common law fraud. Therefore, we conclude that deceptive trade practices, as defined under NRS Chapter 598, must only be proven by a preponderance of the evidence.

3  *Id.* at __, 232 P.3d at 435–36 (internal quotations omitted). The Court further rejected the argument that

4  deceptive trade practices actions are not applicable to actions concerning the purchase of real property,

5  and upheld the district court jury's decision. *Id.*

6  In light of *Betsinger*, Mortgage Capital's arguments that Plaintiff has not pled his NRS

7  598.0915 claim with sufficient particularity are without merit. Defendants actions place them squarely

8  within the purview of the statutory provisions, and, as such, Plaintiff's claim for deceptive trade

9  practices should not be dismissed.

10  ### 4.    Negligence and Constructive Fraud Claims

11  Mortgage Capital attacks Mr. Jaime's negligence and constructive fraud claims by arguing that

12  lenders owe absolutely no duty to borrowers. Under Nevada law, "[a] fiduciary relationship is deemed to

13  exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a

14  duty of the utmost good faith." *Giles v. GMAC*, 494 F.2d 865 (9th Cir. 2007) (citing *Hoopes v.*

15  *Hammargren*, 102 Nev. 425, 725 P.2d 238, 242 (1986)). In *Mackintosh v. Jack Matthews Co.*, 109 Nev.

16  628, 855 P.2d 549 (1993), the Nevada Supreme Court found that a special relationship exists in

17  mortgage transactions, which gives rise to a duty to disclose, such that "nondisclosure will become the

18  equivalent of fraudulent concealment when it becomes the duty of the person to speak in order that the

19  party with whom he is dealing may be placed on an equal footing with him. The duty to speak does not

20  necessarily depend on the existence of a fiduciary relationship." *Id.* at 634–35, 855 P.2d at 553 (quoting

21  *Central States Stamping Co. v. Terminal Equipment Co.*, 727 F.2d 1405, 1409 (6th Cir. 1984)). The

22  Nevada Supreme Court further held that such "may arise in any situation where one party imposes

23  confidence in the other because of that person's position, and the other party knows of this confidence."

24  *Id.*

25  The *Mackintosh* opinion established the two-pronged "special relationship" test which requires:

26  (1) a finding by the jury that the conditions surrounding the transaction are such that only a reasonable

27  person would "impart special confidence" in the lender, and (2) a finding by the jury that a reasonable

28  lender would have known of this confidence. *Id.* Regarding the second prong of the "special

17

1  relationship" test, it should be noted that the Court in *Mackintosh* found that the lender should have

2  known about the "confidence" which had been placed in the lender by the borrowers even though no

3  direct communication had taken place between the lender and borrowers during the loan origination

4  process. *Id.* at 402–03, 935 P.2d at 1160.

5  In the present case, first, Mr. Jaime trusted the broker/lender to help him understand the

6  complex terms found in the First Mortgage. *See Aff. of Jaime* at ¶¶ 7–9. He knew how much he could

7  afford for a monthly payment, but he had no idea how the variable interest rate terms and negative

8  amortization provisions would impact his ability to repay on the loans. *Id.* When he voiced his concerns

9  to the broker/lender he was told not to worry about it, and that he "could always refinance." *Id.* Under

10 these facts, a jury could find that it was reasonable for Mr. Jaime to "impart special confidence" into the

11 broker/lender. Second, lenders like Mortgage Capital know or should know that subprime borrowers,

12 like Mr. Jaime, are placing trust in them to help them determine whether or not they can afford a certain

13 loan. Like in *Mackintosh*, where the Court held that the lender should have known of the trust that had

14 been placed in the lender by the borrower even though no direct communication took place between the

15 lender and borrower, this Court should find that Mortgage Capital knew or should have known that Mr.

16 Jaime was relying on Mortgage Capital in determining whether he could afford the mortgage or not.

17 These questions should be determined by the fact-finder.

18 A "special relationship" existed between Mr. Jaime and Mortgage Capital, one that imposed a

19 legal duty upon Mortgage Capital. This special relationship may not support the existence of a fiduciary

20 duty owed by Mortgage Capital to Mr. Jaime, but at the very least, Mortgage Capital owed a duty to

21 disclose the fact that its sole justification for funding Mr. Jaime's loans was its gamble that the Anasazi

22 Property would rapidly appreciate in value. By failing to properly inform Mr. Jaime of the true basis for

23 its lending decision, and by not offering Mr. Jaime a loan which he could reasonably afford, Mortgage

24 Capital breached the duty it owed to him. Mortgage Capital's breach caused Mr. Jaime serious personal

25 and economic harm. Therefore, Plaintiff's claims for negligence and constructive fraud should not be

26 dismissed as the Complaint provides sufficient notice to Defendants, and the claims have a valid legal

27 basis.

28 ///

### 5.    Fraud and Negligent Misrepresentation Claims.

Defendants' assertion that Plaintiff's Complaint fails the particularity requirement of Fed. R. Civ. P. 9(b) is, again, without merit. Mr. Jaime is currently without the necessary documentation to definitively identify the person who acted as the mortgage broker with respect to the purchase of the Anasazi Property; however, Mr. Jaime has sufficiently pled that it was affirmatively represented to him by the broker/lender that he could afford to assume the obligations of the loans offered by Mortgage Capital given his income at the time even though Mortgage Capital knew that Mr. Jaime could not afford the loans with monthly income at the time.

As set forth in the Complaint, Plaintiffs allege the following:

- Plaintiffs entered into an agreement of special confidence with Defendants, who agreed to help Plaintiffs find an appropriate loan on the Property. (*See* Complaint ¶ 23).

- Defendants knew Plaintiffs were relying upon the superior knowledge and expertise of Defendants to qualify for the loan.(*See* Complaint ¶ 24).

- Defendants shopped for a loan based upon economic compensation that favored Defendants, not Plaintiffs. (*See* Complaint ¶ 26).

- Defendants did not convey to Plaintiffs material information about other loans that were available to be applied for, and/or what the economic compensation to Defendants would be under the other loans.(*See* Complaint ¶ 27).

- Defendants created and submitted to the lender containing statements of material fact about Plaintiffs which were erroneous and which omitted known factual information about Plaintiffs. (*See* Complaint ¶ 28).

- Prior to purchasing the mortgage loan, defendants knew or reasonably should have known that Plaintiffs were likely to default on their obligations under the loan agreement. (*See* Complaint ¶ 34).

- Plaintiffs were not fully and properly informed of the material provisions of the transaction, including the loan terms, consequences of entering into the loan, reasonably available alternatives to the loan offered, and their rights of rescission.(*See* Complaint ¶ 37).

At the time Mr. Jaime sought financing from Mortgage Capital he was making $3,500.00 a month and owned two other mortgage-encumbered properties. *See Aff. of Jaime* at ¶¶ 1–5. The note for the First Mortgage contained variable terms regarding the interest rate and monthly payments. *See* **Exhibit "2."** These provisions resulted in Mr. Jaime initially paying an amount which would not even reduce the total amount owed under the loan, followed by the monthly payment adjusting up to

1  $2,200.00 a month at the time of his default. *See Aff. of Jaime* at ¶ 11. The person who represented to

2  Mr. Jaime that he could afford the mortgage defrauded him. Mortgage Capital, whether it made the

3  fraudulent representations or not, is liable for the harm caused to Mr. Jaime as a result of its involvement

4  in this civil conspiracy to defraud him. *See supra* Part III.D.2.

5          Moreover, at this time, Plaintiff is not in possession of any documentation from Defendants to

6  substantiate (or refute, as the case may be) the full amount of what information was included on the loan

7  application and other documents. Thus, discovery is needed on this issue to more fully flesh out the

8  bases for the fraud claims. As noted in Plaintiff's Complaint, the Nevada Supreme Court has adopted the

9  relaxed pleading requirements that the federal courts utilize when facts necessary for the plaintiff to

10 plead a cause of action for fraud with particularity under Fed. R. Civ. P. 9(b) are peculiarly within the

11 defendants' knowledge or possession. Importantly, in *Rocker v. KPMG LLP*, 122 Nev. 1185, 148 P.3d

12 703 (2006), the Nevada Supreme Court held:

13              Under Federal Rule of Civil Procedure 9(b), which contains language
                identical to NRCP 9(b), federal courts have recognized an exception to
14              particularized pleading. When the facts necessary for pleading with
                particularity "are peculiarly within the defendant's knowledge or are readily
15              obtainable by him," FRCP 9(b)'s pleading rule is relaxed because the
                "plaintiff[] cannot be expected to have personal knowledge of the relevant
16              facts."

17 *Id.*, 122 Nev. at 1193, 148 P.3d at 708 (citations omitted). In such cases, "if the plaintiff pleads specific

18 facts giving rise to an inference of fraud, **the plaintiff should have an opportunity to conduct**

19 **discovery and amend his complaint to include particular facts**." *Id.*, 122 Nev. at 1187, 148 P.3d at

20 704.

21          As stated above, Plaintiff is not currently in possession of the original loan files from any of the

22 Defendants and, therefore, cannot verify the information contained on the loan application documents or

23 determine what actions were taken by Defendants at the time of the loan origination and in the weeks

24 and days leading up to the closing on the loans. Consequently, discovery is needed on this issue to more

25 fully flesh out the bases for the fraud claims. Therefore, if this Court finds that Plaintiff did not plead

26 the fraud claims with enough particularity, then leave should be granted, to allow Plaintiff to amend the

27 fraud claims after some discovery is completed, and Plaintiff is provided copies of the original loan files.

28 Accordingly, Plaintiff respectfully request that Defendants' motion to dismiss these claims for fraud and

1  negligent misrepresentation be denied.

2      **6.    Breach of Contract and Breach of Contractual Covenant of Good Faith and Fair Dealing Claims**

3

4      In the matter at hand, the contracts at issue include not merely the Note and the Deed of Trust,

5  but the pre-qualification papers entered into between Plaintiffs and Countrywide. As previously stated

   herein, Mr. Jaime entered into a contract with the broker/lender to obtain financing that Mr. Jaime could

6  afford. As part of that agreement, the broker/lender agreed that it would only offer financial products that

7  were suitable to Mr. Jaime's needs and economic status. By offering a mortgage with usurious terms,

8  and then convincing Mr. Jaime to enter into the mortgage by telling him that "he could afford it," the

9  broker/lender breached the contract. At this point, it cannot be determined whether Mortgage Capital

10  acted as a broker to Mr. Jaime without first conducting some preliminary discovery. However, Plaintiff

11  has sufficiently pled his breach of contract claim to put Mortgage Capital on notice. Should it be

12  discovered that Mortgage Capital had no involvement in the brokerage agreement, then it would be

13  appropriate at that time to dismiss Plaintiff's breach of contract claim as to Mortgage Capital at that

14  time.

15      Defendant's primary assertion with regard to the claim for breach of contractual covenant of

16  good faith and fair dealing is that Plaintiff failed to allege the existence of a contract between Plaintiff

17  and Defendants, as well as any wrongful conduct by Defendants in their performance of the contract.

18  Notwithstanding these assertions, Mortgage Capital breached the covenant of good faith and fair dealing,

19  and Plaintiff pleaded as much in her Complaint.

20      Here, Plaintiff's allegations against Defendants in this regard are clear; there are and were

21  numerous deficiencies, inconsistencies, and misstatements that are apparent on the face of the loan

22  documents, which misinformation the broker intentionally and willfully included, and which Mortgage

23  Capital relied upon.  The deficiencies and inconsistencies were so apparent that, at the very least, it

24  should have prompted Mortgage Capital to request additional information to investigate the veracity of

25  the loan documents and/or Mr. Jaime's ability to repay on the loans prior to funding the loans.

26      A party's adherence to standards of good faith and fair dealing will not prevent a failure to

27  perform a duty from amounting to a breach.  The extent to which the behavior of the party failing to

28

1   perform or to offer to perform comports with standards of good faith and fair dealing is, however, a

2   significant circumstance in determining whether the failure is a material breach. *Restatement (Second)*

3   *of Contracts* § 241 cmt. f (1981). Here, Mortgage Capital's reliance on deficient loan application

4   documents, their failure to investigate or look into the deficiencies on the loan documents, their failure to

5   advise Plaintiffs of those deficiencies so that they could investigate amounts to a breach of the

6   contractual covenant of good faith and fair dealing. Therefore, this claim should not be dismissed as it

7   pertains to Mortgage Capital.

8       **E.  Defendants' Motion to Dismiss is a Thinly-Veiled Motion for More Definite Statement.**

9   Fed. R. Civ. P. 12 (e) provides:

> A party may move for a more definite statement of a pleading to which a
> responsive pleading is allowed but which is so vague or ambiguous that the
> party cannot reasonable prepare a response. The motion must be made
> before filing a responsive pleading, and must point out the defects
> complained of and the details desired.

FRCP 12(e). Defendant has filed a motion to dismiss alleging a lack of specificity with regards to several

of Plaintiff's claims previously addressed in this Opposition. The gist of much of the motion to dismiss

is really that Plaintiff should provide more specific information. However, as rather than file an

appropriate motion for more definite statement, Defendant has attempted to circumvent the Rule 12(e)

process by simply moving to dismiss the claims for which it allegedly needs more information.

Accordingly, Plaintiff respectfully request that, in an alternative to dismissing any claims, this Court

treat those claims for which Defendant seeks a dismissal based upon an alleged lack of information as a

motion for more definite statement with regard to those claims, thus allowing Plaintiff the opportunity to

provide the court-ordered specifics.

///

///

///

///

///

///

22

**III.    CONCLUSION**

For the above mentioned reasons, Plaintiff respectfully requests that the Court deny Mortgage

Capital's Motion to Dismiss.

DATED this ___ day of October, 2010.

HALL JAFFE & CLAYTON, LLP

By _____
MICHAEL R. HALL
Nevada Bar No. 005978
STEVEN T. JAFFE
Nevada Bar No. 007035
JACOB S. SMITH
Nevada Bar No. 010231
7455 West Washington Avenue, Suite 460
Las Vegas, Nevada 89128
*Attorneys for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2

3      Pursuant to F.R.C.P. 5(b), I hereby certify that service of the foregoing **MOTION TO
4      REMAND** was made this _18th_ day of October, 2010, via electronic service to the following:

5                          J. Christopher Jorgensen, Esq.
                              LEWIS AND ROCA, LLP
                         3993 Howard Hughes Pkwy., Ste 600
6                              Las Vegas, NV 89169
                        *Attorneys for BAC Home Loans Servicing, LP*
7
                              G. Dallas Horton, Esq.
8                        G. DALLAS HORTON & ASSOCIATES
                              4435 S. Eastern Avenue
9                              Las Vegas, NV 89119
                               *Attorneys for Plaintiff*
10
                              Robert D. Vannah, Esq.
11                              VANNAH & VANNAH
                         400 S. Fourth Street, 6th Floor
12                             Las Vegas, NV 89101
                               *Attorneys for Plaintiff*
13

14

15      _____
                          An Employee of
16                  HALL JAFFE & CLAYTON, LLP

17

18

19

20

21

22

23

24

25

26

27

28

24

1

## AFFIDAVIT OF ARIEL JAIME

2

3  STATE OF NEVADA        )
                          ) SS:
4  COUNTY OF CLARK        )

5

6      ARIEL JAIME, being first duly sworn, deposes and says:

7      1.      On or about May 25, 2005, I purchased a property located at 8528 Caladium Court, Las

8  Vegas, Nevada, 89149, also known by Clark County Assessor Parcel number 125-20-712-011,

9  (hereinafter "the Caladium Property"). At the time I purchased the Caladium Property, I already owned a

10  home in Valencia, California, which was my primary residence.

11     2.      I purchased the Caladium Property for my sister who was living in Las Vegas, Nevada at

12  the time. It was agreed that I would purchase the home, and my sister would pay me rent equal to the

13  monthly mortgage payment.

14     3.      Sometime in or near October of 2006, I received a job offer in Las Vegas, Nevada, to work

15  as a Spanish-English translator. I accepted the job offer and began making arrangements to move to Las

16  Vegas.

17     4.      I put my home in Valencia, California, up for sale and began looking for a home to

18  purchase in Las Vegas. However, I had difficulty selling the home, so I began renting the house and using

19  the rental income to cover most of the monthly mortgage payments.

20     5.      On or near December 29, 2006, I purchased a home located at 8039 Anasazi Ranch

21  Avenue, Las Vegas, Nevada 89131, known by Clark County Assessor Parcel number 125-21-211-035

22  (hereinafter "the Anasazi Property"). At the time I purchased the home I was making approximately

23  $3,500.00 per month.

24     6.      In order to finance the purchase of the Anasazi Property, I contacted a mortgage broker;

25  however, at this time, I am without sufficient knowledge and documentation to verify the identity of the

26  broker. His name was Fernando and he had previously helped me refinance my home in Valencia. I am

27  not sure whether Fernando was an employee of Mortgage Capital Associates, Inc., or whether he

28  represented a mortgage brokerage.

7.      During the loan application process, I was asked only general questions regarding my income, *e.g.*, "How much do you make a month?" I never personally filled out any loan application documents, but later signed those documents when they were presented to me already filled out. At no time during the application process was I ever questioned about the fact that I owned two other properties.

8.      In deciding to purchase the Anasazi property, I relied on the representations made by the mortgage broker regarding my ability to afford the monthly mortgage payments. I knew how much I could afford at that time with respect to the monthly payment, but I did not, and do not, have sufficient knowledge and understanding regarding, for example, the variable interest rate provisions to have been able to know whether I would be able to afford the purchase of a home under such terms in the future.

9.      Thus, when I was told by the mortgage broker that my monthly payment would be approximately $1,200.00, I believed that I would be able to make the monthly mortgage payments given my income at the time. However, I could not anticipate how my ability to repay on the loans would be affected in the event that the monthly payment changed. It was for this reason that I relied on the mortgage broker's representations regarding my ability to afford the home in deciding to go through with the purchase of the property.

10.     At the closing of the Anasazi Property, which occurred on or near December 29, 2006, I was not informed that the mortgage contained provisions making it an adjustable-rate, interest only, negative amortization mortgage.

11.     The initial payment on the loans was approximately $1,200.00 per month, but that amount increased to $2,200.00 near the time I defaulted on the house in August of 2009. None of the terms of the loans were explained to me. I was simply told to "sign here, here, and here," without ever being told what I was signing. Whenever I voiced any concern I was told "not to worry about it," and that I "could always refinance" if it became too difficult for me to make the mortgage payments. To that end, however, it was never explained to me that if I were to refinance the property that I would have to pay a prepayment penalty to the lender.

12.     I managed to make the payments on the mortgage for more than two years, even though the job offer which initially brought me to Las Vegas fell through. With the collapse of the economy, my

1    sister and the renters living in my home in Valencia, found that they were unable to make the rental

2    payments to me as they had come under difficult financial times.

3        13.    I could not afford the mortgage payments on the Valencia and Caladium Properties, as I

4    was having difficulty making the payments on the Anasazi Property as well. Refinancing the properties

5    was not an option since the value of the homes was worth far less than what I owed on them. Faced with

6    the burden of this insurmountable debt, I determined that my only recourse was to let the properties go

7    into foreclosure and seek protection under bankruptcy.

8        14.    On September 16, 2008, I filed for bankruptcy. A short time prior to filing for bankruptcy,

9    I met with a bankruptcy attorney. During my meeting with him, I first became aware of the predatory

10   lending practices that were perpetrated by the broker/lender with respect to the purchase of the Anasazi

11   Property.

12       15.    The bankruptcy attorney could not understand how I was able to receive financing for the

13   $362,803.00 Anasazi Property even though I only made $3,500.00 a month at the time, and already

14   owned two other properties. After our meeting, I reviewed the closing documents and realized that the

15   mortgages for the Caladium and Anasazi Properties both contained terms—*e.g.*, variable interest rate,

16   interest only amortization schedule, prepayment penalty provision, etc.—that I had never heard of and

17   would not have agreed to had I been informed of them.

18

19   FURTHER YOUR AFFIANT SAYETH NAUGHT.

20       Dated this _18_ day of October, 2010.

21

22

23                                                        ARIEL JAIME

24   SUBSCRIBED and SWORN TO before me
     this _18th_ day of October, 2010.

25

26   Notary Public in and for
27   said County and State

28

NOTARY PUBLIC
DONNA N. BIBY
STATE OF NEVADA - COUNTY OF CLARK
MY APPOINTMENT EXP. JULY 27, 2013
No: 01-71227-1

3