1  G. DALLAS HORTON
   Nevada Bar No. 005996
2  **G. DALLAS HORTON & ASSOCIATES**
   4435 S. Eastern Avenue
3  Las Vegas, NV 89119
   Phone: 702-380-3100
4  Fax: 702-385-3101

5  MICHAEL R. HALL
   Nevada Bar No. 005978
6  STEVEN T. JAFFE
   Nevada Bar No. 007035
7  JACOB S. SMITH
   Nevada Bar No. 010231
8  **HALL JAFFE & CLAYTON, LLP**
   7455 West Washington Ave., Suite 460
9  Las Vegas, Nevada 89128
   Phone: 702-316-4111
10 Fax: 702-316-4114

11 ROBERT D. VANNAH
   Nevada Bar No. 002503
12 MARK L. JACKSON
   Nevada Bar No. 010905
13 **VANNAH & VANNAH**
   400 S. 4th Street, 6th Floor
14 Las Vegas, NV 89101
   Phone: 702-369-4161
15 Fax: 702-369-0104

16 *Attorneys for Plaintiffs*

17 **UNITED STATES DISTRICT COURT**

18 **DISTRICT OF NEVADA**

19 YVETTE WEINSTEIN, CHAPTER 7          CASE NO.: 2:10-cv-01551-PMP-PAL
   TRUSTEE OF THE ARIEL JAIME
20 BANKRUPTCY ESTATE.                    **OPPOSITION TO BAC HOME LOANS**
   (Re: 8039 Anasazi Ranch Drive)        **SERVICING, LP'S MOTION TO DISMISS**
21                                        **PLAINTIFF'S COMPLAINT PURSUANT**
                                          **TO FRCP 12(b)(6)**
22                         Plaintiff,

23 vs

24 MORTGAGE CAPITAL ASSOCIATES, INC,
   Foreign Corporation; EMC MORTGAGE
25 CORPORATION, Foreign Corporation; BAC
   HOME LOANS SERVICING, LP, Foreign
26 Limited Partnership; ROE Rating Company;
   DOES 1- 100, inclusive; ROE ENTITIES 1-100;
27 ROE CORPORATIONS 1 - 100, inclusive.

28                         Defendants

1    COMES NOW, Plaintiff YVETTE WEINSTEIN, CHAPTER 7 TRUSTEE OF THE ARIEL

2 JAIME BANKRUPTCY ESTATE,, by and through her attorneys MICHAEL R. HALL, ESQ., STEVEN

3 T. JAFFE, ESQ., and JACOB S. SMITH, ESQ. of the law firm of HALL, JAFFE & CLAYTON, LLP,

4 and G. DALLAS HORTON, ESQ. of the law firm of G. DALLAS HORTON & ASSOCIATES, and

5 ROBERT D. VANNAH, ESQ., and MARK L. JACKSON, ESQ. of the law firm of VANNAH &

6 VANNAH, hereby files her Opposition to Defendant BAC Home Loans Servicing, LP's Motion to

7 Dismiss.

8    This Opposition is made and based upon the pleading and papers on file herein, the affidavits

9 and exhibits attached hereto, and any oral argument that may be presented at the time of the hearing on

10 this matter.

11                          **MEMORANDUM OF POINTS AND AUTHORITIES**

12 **I.    INTRODUCTION**

13    The facts of this matter present the quintessential case for predatory lending. While predatory

14 lending practices are not easily defined, they are most clearly made manifest in transactions wherein

15 certain parties—*e.g.*, home sellers, mortgage brokers, lenders, loan servicers, etc.—take advantage of

16 informational asymmetries in order to reap above market profits at the expense of the borrower and

17 society as a whole. These information asymmetries, however, are not a function of the expertise, hard

18 work, or ingenuity of these parties; rather, they are a function of the disproportionate bargaining power

19 that exists between subprime borrowers and subprime lenders. Transactions falling under the umbrella of

20 predatory lending are as varied and diverse as the financial instruments that are concocted in the

21 imaginations of subprime lenders. It is generally true, however, that subprime lenders implement

22 predatory lending practices with the greatest frequency against minorities and the poor. *See generally*

23 Cassandra Jones Havard, *Invisible Markets Netting Visible Results: When Sub-Prime Lending Becomes*

24 *Predatory*, 26 Okla. City U. L. Rev. 1057 (2001).

25    In this case, Defendant BAC Home Loans Servicing, LP (hereinafter "BAC") would have this

26 Court believe that it played absolutely no role with regard to the predatory lending tactics that were used

27 against Plaintiff Ariel Jaime (hereinafter "Mr. Jaime"). Granted, BAC's misconduct may not fit "neatly"

28 within certain remedies currently provided by the statutory and common law; however, BAC's business

practices, along with the business practices of other subprime lenders, created a system in which BAC was able to extract profits in excess of what the market would normally bear by making a "gamble" on the continued appreciation of the housing market, a gamble which was never disclosed to Mr. Jaime or other subprime borrowers. *See generally* Timothy Geithner & Lawrence Summers, *A New Financial Foundation,* Wash. Post, June 15, 2009, at A15. This gamble has led to the most disastrous financial meltdown of the American economy since the Great Depression. In the aftermath of what has been called the "Great Recession," courts and legislatures have been struggling with deciding who should bear the blame, along with its consequences, for the lending practices which in hindsight seem so utterly ridiculous.

More than three years after the housing market crash of 2007, much has changed in terms of the statutory remedies available to the victims of predatory lending practices. *See, e.g.,* NRS 598D.100 (amending the 2003 version of the statute to include clearer language regarding the illegality of making loans without verifying the borrower's ability to repay). However, the courts have been slow to provide relief to borrowers under common law causes of action such as fraud, negligence, and civil conspiracy. Commentators have argued that the courts' reluctance to provide relief under the common law is not so much a function of the lack of merit of the predatory lending cases being brought before the bar, but rather that the common law has not sufficiently evolved to handle the unique misconduct perpetrated by predatory lenders. *See* Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of Predatory Lending,* 80 Tex. L. Rev. 1255, 1298 (2002); *see also* Susan E. Hauser, *Predatory Lending, Passive Judicial Activism, and the Duty to Decide,* 101 N.C. L. Rev. 86 (2008). Thus, aggrieved borrowers have been left scrambling as they try to seek retribution through a patchwork of common law causes of action for the indisputably dishonest and reckless acts committed by predatory lenders which caused subprime borrowers substantial personal and economic harm. Moreover, borrowers are left in an even more precarious position given that in many instances the mortgage lenders, brokers, and servicers have almost exclusive control over the evidence that borrowers would need to even overcome a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6).

While BAC would have this Court believe it was simply an innocent bystander which is far removed from any misconduct perpetrated by the mortgage broker, such is not truly the case. As will be

3

1  explained below, BAC purchased and/or serviced Mr. Jaime's loan of which it knew, or should have

2  known, that the financial information contained on the loan application and other mortgage documents

3  was falsified by the mortgage broker. Alternatively, if it is shown that the loan application documents

4  accurately reflected Mr. Jaime's financial status, BAC's conspiratorial practice of purchasing/servicing

5  subprime loans that should not have been funded given the borrowers actual ability to repay the loan

6  drove up demand for subprime mortgages and incentivized brokers and lenders to adopt predatory

7  practices. In short, BAC colluded with the other Defendants in this case to place Mr. Jaime in a loan

8  which it knew, or should have known, Mr. Jaime could not afford, while communicating to him, either

9  expressly or impliedly,  that the mortgage fit within his budget.  Accordingly, BAC should not be

10  allowed to escape justice through a motion to dismiss.

11  **II.      STATEMENT OF FACTS AND PROCEDURAL HISTORY**

12         **A.  Relevant Facts.**

13         On or about December 29, 2006, Ariel Jaime ("Mr. Jaime" or "Debtor") purchased real

14  property located at 8039 Anasazi Ranch Avenue, Las Vegas, Nevada 89131, also known by Clark

15  County Assessor Parcel number 125-21-211-035, (hereinafter "The Property"). *See* Clark Country

16  Recorder's Office Property Records, attached hereto as **Exhibit "1"**.  Mr. Jaime received financing for

17  the purchase of the Anasazi Property from Defendant Mortgage Capital Associates, Inc  ("Mortgage

18  Capital").

19         Prior to his purchase of the Anasazi Property, Mr. Jaime was living in Valencia, California,

20  where he owned a home. *See* Affidavit of Ariel Jaime (hereinafter *Aff. of Jaime*), at ¶ 2. Additionally, a

21  short time before he moved to Las Vegas he purchased a home located at 8528 Caladium Court, Las

22  Vegas, Nevada, 89149, also known by Clark County Assessor Parcel number 125-20-712-011, for his

23  sister with the agreement that she would make the mortgage payments. *Id.* at ¶ 1.

24         Sometime prior to December of 2006, Mr. Jaime received a job offer in Las Vegas as a

25  Spanish-English translator. *Id.* at ¶ 3. Mr. Jaime accepted the job and subsequently entered into the

26  contract to purchase the Anasazi Property. *Id.* at ¶ 5. He tried to sell his home in Valencia, but was

27  unable to do so; however, he was able to rent the home which allowed him to cover the costs of the

28  home's mortgage. *Id.* at ¶ 4.

1    At the time Mr. Jaime purchased the Anasazi Property, he was only making $3,500.00 a month.

2    *Id.* at ¶ 5. Mr. Jaime met with someone regarding the purchase of the property, but he is currently unable

3    to determine exactly with whom he dealt with in securing financing for the purchase of the Anasazi

4    Property. *Id.* at ¶ 6.[1] Regardless, the broker/lender was not concerned that Mr. Jaime mad only $3,500.00

5    a month and already owned two other mortage-encumbered properties. *Id.* at ¶ 11. The broker/lender

6    filled out the loan application for Mr. Jaime, and then had Mr. Jaime simply sign the documents once

7    they were complete. *Id.* Mr. Jaime was approved by Mortgage Capital to finance the full purchase price

8    of the Anasazi Property with no further inquiry being made into Mr. Jaime's ability to repay the loans.

9    *Id.*

10    The Total purchase price for the Property was $362,803.00, the full amount of which was

11    borrowed from Mortgage Capital. *See* First and Second Notes, attached hereto as **Exhibits "2" and "3"**,

12    respectively. The borrowed amount was spread over two (2) separate mortgages, the first mortgage

13    ("First Mortgage") in the amount of $290,242.00 with an initial interest rate of 1.00%. The First

14    Mortgage was structured as an adjustable-rate, interest only loan arm, with an initial monthly payment of

15    $933.53. After two months, the rate would adjust by adding 3.125 percentage points to the current index

16    rate, meaning Plaintiff's interest rate on the principal could have reached as high as 9.950%. The rate

17    would adjust every month for the remainder of the loan. *See* **Exhibit "2".** In light of the fact that the

18    total amount owed on the loan would increase as the interest rate increased, provisions in the First

19    Mortgage capped the monthly payment to increase by 7.5% in February 2008, and by 7.5% on February

20    1 of each year thereafter. Thus, not only would Mr. Jaime's monthly payment increase, by it would

21    increase to an amount below what would be required to actually reduce the total amount owed on the

22    loan, which would make the loan a negative amortization mortgage. In other words, Mr. Jaime's

23    required payments were not even paying the interest on the loan, and the remaining unpaid interest was

24    being added to the principal loan amount. *Id.*

25    In addition to the negative amortization provisions of the First Mortgage, the loan also included

26    a prepayment penalty if Mr. Jaime were to prepay sooner than one year after the loan was closed. *Id.* The

27

28    [1] It is assumed that a mortgage broker referred Mr. Jaime to Mortgage Capital as the lender, but it is even possible that Mortgage Capital acted as the broker itself.

1  effect of such prepayment penalties is to "strip" the equity out of the house and allocate it to the lender.

2  *See* Kathleen C. Engel & Patricia A. McCoy, *A Tale of Three Markets: The Law and Economics of*

3  *Predatory Lending*, 80 Tex. L. Rev. 1255, 1263 (2002) (explaining the relationship between prepayment

4  penalties and equity stripping).

5        The second mortgage ("Second Mortgage" or "Second") was for 36,280.00 at a rate of 9.00%,

6  requiring a monthly payment of $291.92. *See* **Exhibit "3".** The second would require a balloon

7  payment of the remaining unpaid balance after 15 years. *Id.*

8        Throughout the lending process, several misstatements, deficiencies, misrepresentations, and

9  other fraudulent, misleading, and deceptive practices were employed by the broker and Mortgage Capital

10  Associates, Inc, (and later ratified by BAC). Specifically, Mr. Jaime was repeatedly told that he could

11  afford the payments under the terms of the First and Second Mortgages on the Anasazi Property based

12  upon his income alone. It was never explained to him that Mortgage Capital's sole justification for

13  lending him the funds to purchase the house was Mortgage Capital's calculated gamble that the home

14  would quickly appreciate in value, which would have enabled Mr. Jaime to refinance or sell the home.

15  Despite having never revealed this gamble to Mr. Jaime, the loans were processed, approved, and

16  funded, and the Deeds of Trust were recorded. Defendant Mortgage Capital subsequently sold the loans

17  to Defendant BAC, who serviced the loans, and ultimately foreclosed on loans that should never have

18  been issued in the first place.

19        After managing the mortgage payments for over two years, Mr. Jaime could no longer afford

20  the payments and fell behind. *Aff. of Jaime* at ¶ 12. On August 14, 2009, a Default was recorded by

21  Defendants, and on August 13, 2010, a Notice of Trustee sale was recorded on the property. *See* **Exhibit**

22  **"1"**.

23        **B.  Relevant Procedural History**

24        On or about August 16, 2010, Plaintiff filed her Complaint in the Eighth Judicial District Court

25  of Clark County, Nevada, Case No. A610034 asserting causes of action against Defendants for breach of

26  contract, breach of contractual covenant of good faith, violation of NRS 598D Prohibiting Unfair

27  Lending Practices, violation of the consumer fraud statute under NRS 41.600, violation of NRS 598

28  prohibiting deceptive trade practices, fraud, constructive fraud, negligent misrepresentation, negligence,

1 | tortious interference with contract, and civil conspiracy.

2 |     Plaintiff also wishes to name the broker involved with the Loans, but currently possesses
3 | extremely limited documentation with regard to the loans. Specifically, Plaintiff is not in possession of
4 | any of the closing documents including the Uniform Residential Loan Application, which would reveal
5 | the name of the company and person who brokered the loans.

6 |     On September 11, 2010, BAC filed its Petition for Removal, based upon federal question
7 | jurisdiction this Court has over the Truth in Lending Act ("TILA"), the Real Estate Settlement
8 | Procedures Act ("RESPA"), and the Fair Credit Reporting Act ("FCRA"). Defendant also based its
9 | removal on diversity jurisdiction. On September 30, 2010,BAC filed its motion to dismiss pursuant to
10 | Fed. R. Civ. P. 12(b)(6). This opposition to the motion to dismiss now follows.

11 | **III.   ARGUMENT**

12 |     **A.  Standard of Review**

13 |     Plaintiff first notes the well-settled and oft-repeated bedrock principle of Nevada jurisprudence
14 | that Courts favor resolving cases on their merits rather than through procedural technicalities. *Hotel*
15 | *Last Frontier v. Frontier*, 79 Nev. 150, 155, 380 P.2d 293 (1963); *see also Hansen v. Universal Health*
16 | *Services, Inc.*, 112 Nev. 1245, 1248; 924 P.2d. 1345 (1996); *Price v. Dunn*, 106 Nev. 100, 105, 787 P.2d
17 | 785, 787 (1990).

18 |     In *Hotel Last Frontier v. Frontier*, the Nevada Supreme Court reversed the denial of a lessor's
19 | motion to set aside a default judgment that had been granted. *Hotel Last Frontier v. Frontier*, 79 Nev.
20 | 150, 155, 380 P.2d 293 (1963). The court reasoned that because there was no bad faith, and because the
21 | lessor had a meritorious defense, the default judgment should be overturned. In doing so, the Court
22 | explicitly acknowledged a "basic underlying policy to have each case decided upon its merits," holding
23 | that "in the normal course of events, justice is best served by such a policy." *Id.*

24 |     Accordingly, if this Court were to grant the instant Motion, Plaintiff would be denied justice, as
25 | they would lose any and all opportunity to have their case tried on the merits. Justice is best served by
26 | determining actions on their merits.

27 |     A complaint can be dismissed under Fed. R. Civ. P. 12(b)(6) only if it appears beyond doubt
28 | that the plaintiff can prove no set of facts in support of a claim which would entitle plaintiff to relief.

1  *Brennan v. Straub,* 246 F. Supp. 2d 360 (S.D. N.Y. 2003). Further, a complaint need not contain direct

2  allegations on every material point to sustain recovery, but may contain allegations from which inference

3  fairly may be drawn that evidence on the material points will be introduced at trial. *Graves v. Tubb* 281

4  F.Supp. 2d 886 (N.D. Miss. 2003).

5  A two-step approach should be applied when considering motions to dismiss. *Ashcroft v. Iqbal,*

6  129 S.Ct. 1937, 1950 (2009). First, the court must accept as true all factual allegations in the complaint,

7  and second, the court must consider whether the factual allegations in the complaint allege a plausible

8  claim for relief. *Id.* at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that

9  allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct."

10  *Id.* at 1949.

11  In applying this standard of review to the matter at hand, it is apparent that Plaintiff's

12  Complaint alleges facts which are sufficient to support the causes of action set forth. While BAC may

13  take issue with the layout or format of the Complaint, such does not merit a dismissal where valid

14  factual and legal assertions exist.

15  **B.  Defendant's Motion to Dismiss is Premature And Should Not Be Decided Until This Court Has Determined Whether Removal Was Appropriate.**

16

17  United States Code §1447 (2008) entitle, "Procedure After Removal Generally," provides:

18  A motion to remand a case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a).**If at any time before final judgment it appears that the district court lacks subject matter**

19  **jurisdiction**, the case shall be remanded.

20  28 U.S.C. §1447(c) (2008)(emphasis added). Defendant BAC filed its Petition for Removal on

21  September 11, 2010, based upon subject matter jurisdiction. More specifically, Defendant BAC has

22  removed this action from the Eighth Judicial District Court of Nevada to this Court on the basis that

23  Plaintiff's causes of action turn on the construction of federal statutes, namely the federal Truth in

24  Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA").

25  On October 8, 2010, Plaintiff filed a Motion for Remand asserting, among other things, an

26  absence of federal question jurisdiction. Plaintiff's Motion for Remand sets forth the reasoning for

27  remanding this matter to the state court in which it was originally filed. It stands to reason that this Court

28  must determine whether or not it has proper jurisdiction over this matter before ruling on a dispositive

1   motion, a ruling which could potentially prove fatal to one or more of Plaintiff's claims against
2   Defendants.

3   ### C. The Claims Against BAC Cannot be Dismissed Because They are Pleaded with Sufficient Specificity and Legal Basis.

4       Despite its dismay at being included as a Defendant in this matter and its insistence that

5   Plaintiff is the party who has acted wrongfully, BAC is not merely the innocent bystander it claims to be.

6   In actuality, BAC, as a subsequent purchaser and/or servicer of the loans, was part of the conspiracy to

7   place Plaintiff in these loans, and therefore is liable for the causes of action which underlie the

8   conspiracy, even if it wasn't directly involved in the origination of the loans. *See Young v. Hamilton*, 92

9   Fed.Appx. 389, 393 (9th Cir. 2003) ("Civil conspiracy . . . imposes liability on persons who, although

10  not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design

11  its perpetration."); *Williams v. Aetna Finance Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859, 868 (Ohio

12  1998) ("in a conspiracy, the acts of the coconspirators are attributable to each other.")

13      In *Ozuna v. Home Capital Funding*, No. 08cv2367-IEG-AJB, 2009 WL 2496804 (S.D. Cal.

14  Aug. 13, 2009), the plaintiff brought an action against the original lender, the mortgage broker, and the

15  subsequent purchaser and servicer of the loan for violations of state and federal laws.  The plaintiff

16  alleged that the original lender and the mortgage broker made misrepresentations concerning the interest

17  rate and other material terms of the loan, and failed to make required disclosures.

18      The subsequent lender filed a motion to dismiss the plaintiff's claims, arguing that as an

19  assignee, it could not be liable for "violations on the face of the documents." *Id.* at 2.  The United States

20  District Court for the Southern District of California held that both an original lender and a subsequent

21  assignee of a creditor, or servicer of a loan, are liable for any violation or defect apparent on the face of

22  the document, including failures to disclose. *Id.* at 3 (emphasis added).  The court reasoned that the

23  plaintiff alleged that the defendants failed to make several disclosures and other violations, which were

24  apparent on the face of the plaintiff's loan documents. *Id.  Ozuna* was based upon TILA disclosures and

25  the complaint in *Ozuna* alleged TILA violations, while the matter in the action at hand is based upon

26  state-law causes of action. Nevertheless, despite the differing causes of action, *Ozuna* drives home the

27  point that a subsequent servicer can be liable for the actions of the original lender, particularly when

28

1  those actions constitute misrepresentations consisting of certain defects apparent on the face of the loan
2  documents.

3      In the matter at hand, BAC relied upon loan documents which contained insufficient
4  information to justify the funding of the loan, or the loan documents had multiple defects,
5  inconsistencies, and false statements apparent on their face. At this time, unfortunately, Plaintiff is
6  without the sufficient documentation to determine the exact nature of the information that was relied
7  upon by BAC in deciding whether to purchase and/or service the loan. Notwithstanding the uncertainty
8  surrounding the true nature of the information contained in the loan application documents, BAC
9  participated in a well-choreographed scheme designed to strip the equity, or at least the equity
10  Defendants speculated would quickly accrue, out of the Anasazi Property by using usurious loan terms
11  which were never explained to Mr. Jaime.

12      The factual allegations asserted against BAC in Plaintiff's Compliant more than "plausibly give
13  rise to an entitlement of relief." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940-41 (2009). As stated above,
14  BAC purchased and/or serviced loans which it knew Mr. Jaime could not afford and which were based
15  upon fraudulent loan application documents of whose veracity BAC intentionally failed to confirm. As a
16  result of BAC's intentional and or reckless business practices, Mr. Jaime was conned into entering a
17  transaction which he could have only afforded if the Property had rapidly appreciated in value. Predatory
18  lenders, like BAC, should be held liable for the undisclosed gambles they made using borrowers' homes
19  as collateral.

20      Plaintiff has pled sufficient facts so as to place all Defendants, including BAC on notice of the
21  claims asserted. Plaintiff pled numerous facts throughout his Complaint which set forth and support each
22  claim asserted against each Defendant, including BAC. Furthermore, the facts of this case show that the
23  original lender had no reasonable justification to make the loans to Mr. Jaime if the lending decision was
24  based solely on Mr. Jaime' ability to repay the loans, and, consequently, BAC has no reasonable
25  justification in purchasing and/or servicing the loans. Accordingly, Plaintiff respectfully requests this
26  Court deny BAC's Motion in its entirety.

27  ///

28  ///

1

### 1.    Unfair Lending Practices Claim

2

Plaintiff's Third Claim for Relief is explicitly premised upon "the Unfair Lending Practices

3

Act, NRS 598D *et. seq*.". NRS 598D.110 states, in pertinent part:

4

    1.    A lender who willfully engages in an unfair lending practice described in this chapter is
guilty of a misdemeanor.

5

6

    2.    If a lender willfully engages in any unfair lending practice described in this chapter in
connection with a home loan, the lender is liable to the borrower in an amount equal to the
sum of:

7

8

        (a)    Three times the amount of any actual damages sustained by the borrower; and

9

        (b)    If the borrower brings an action and is successful in enforcing the liability imposed
by paragraph (a) in the action, the costs of bringing the action and reasonable
attorney's fees as determined by the court.

10

Thus, it clear that Plaintiff's Third Claim for Relief states a valid, recognizable claim against BAC.

11

BAC's other premise for dismissing the claim for violation of NRS 598D is that the 2007

12

version of 598D did not apply to this particular transaction, but rather the 2003 version should be

13

applied, which does not cover this type of transaction. Even assuming *arguendo* the loans are not

14

explicitly covered by the 2003 version of the statute, the legislative history and minutes from the

15

hearings of the original (2003) version of NRS 598D suggest that subprime lenders owe a duty to care to

16

borrowers. For example, in the April 2, 2003 Assembly Committee on Commerce and Labor meeting,

17

the committee discussed the predatory lending situation and how to draft NRS 598D in order to prevent

18

some of these practices. During that meeting, Mr. Ken Scruggs, of the Household Financial Group,

19

stated that "it is felt that it is proper public policy to place special regulations on subprime lenders to

20

ensure that their borrowers are given a fair shake, that they understand what is going on in the

21

transaction, and that they are fully and properly disclosed to." *See* committee meeting minutes of April

22

2, 2003, p.7, attached hereto as **Exhibit "4."**[2] Mr. Scruggs further stated: "I believe that the bill takes

23

the approach that the person that actually makes the loan is responsible to see that the customer is given

24

everything that he needs to have before the loan is closed. As it is currently written, it would also apply

25

to whoever ultimately holds the note if the loan is sold out." *Id.* at p.8 (emphasis added).

26

27

28

    [2]    The committee meeting minutes can be found at http://www.leg.state.nv.us/72nd/Minutes/Assembly/
CMC/Final/2339.html.

1    Additionally, the 2003 version of the statue provides:

2        It is an unfair lending practice for a lender to:

3        [. . .]

4        (b) knowingly or intentionally make a home loan to a borrower based solely upon the equity of the
         borrower in the home property and *without determining that the borrower has the ability to repay*
5        *the loan from other assets, including, without limitation, income.*

6    *Id.* (emphasis added). "Lender" is then defined as "a mortgagee, beneficiary of a deed of trust or other

7    creditor who holds a mortgage, deed of trust or other instrument that encumbers home property as

8    security for the payment of a home loan." *See* Assembly Bill 284, attached hereto as **Exhibit "5."**

9    Though this specific section refers to home equity loans, it reflects the general intentions of the

10   committee members that lenders be responsible for verifying the borrower's ability to repay and that a

11   full disclosure regarding all lending terms be made prior to closing. Thus, the final bill, as passed

12   through the legislature, makes lenders, including subsequent purchasers of the loans, responsible for

13   verifying the borrower's ability to repay the loan.

14       In the instant case, Mortgage Capital did not verify Plaintiff's ability to repay the loan, and he

15   defaulted over two years after the loan was closed. This default occurred despite the fact that Plaintiff

16   provided all of the documents requested to verify such information at the time the loan was originated

17   As the original lender, Mortgage Capital chose instead to close its eyes and ignore the reality of Mr.

18   Jaime's practically inevitable inability to repay the loan. BAC, in its subsequent acquisition and

19   servicing of the Loans, is guilty of the same oversights. As Mr. Scruggs noted, " it would also apply to

20   whoever ultimately holds the note if the loan is sold out." Based upon the above, it is clear that Plaintiff

21   had pled a claim cognizable under NRS 598D and, therefore, that claim for relief should not be

22   dismissed as to BAC.

23           **2.    Civil Conspiracy Claim**

24       Civil conspiracy is an actionable claim recognized by Nevada Courts. *See Jordan v. State,* 121

25   Nev. 44, 74-75, 110 P.3d 30, 51 (2005). In *Hotel Riviera, Inc. v. Short*, the Nevada Supreme Court held

26   that "an act lawful in an individual may be the subject of civil conspiracy when done in concert,

27   provided it is done with a direct intention to injure another, or when, although done to benefit the

28   conspirators, its natural and necessary consequences is the prejudice of the public or the oppression of

individuals." 80 Nev. 505, 512, 396 P.2d 855, 859-860 (1964) (quoting *FTC v. Raymand Bros.-Clark Co.*, 263 U.S. 565, 574 (1924)). A claim of conspiracy-to-defraud requires the following elements: (1) a conspiratorial agreement, (2) an overt act in furtherance of the conspiracy, and (3) resulting damage to the plaintiff. *See Jordan*, 121 Nev. at 74-75, 110 P.3d at 51. It is generally recognized that the conspiracy agreement need not extend to all details of the conspiratorial scheme, and the conspiratorial agreement may be implied from the conduct of the conspirators. *See Lee v. State Farm Mut. Auto. Ins. Co.*, 249 F.R.D. 662, 681 (D. Colo. 2008); *Collyer v. Darling*, 98 F.3d 211, 230 (6th Cir. 1996); *Dalle v. Thomas H. Temple Co.*, 186 Tenn. 69, 90, 208 S.W.2d 344, 353 (Tenn. 1948).

Conspirators may be responsible for a co-conspirator's conduct in furtherance of the alleged conspiracy, even if they have not dealt directly with the injured party. *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 125 (E.D. N.Y. 2000). A conspiracy claim serves to expand liability for the underlying wrong to persons who are not directly involved in the wrongful actions, and includes those who merely plan, assist or encourage the wrongdoer's acts, or who supervise or profit from the tortious conduct. *See generally Plascencia v. Lending 1st Mortgage*, 583 F.Supp.2d 1090, 1100 (N.D. Cal. 2008) ("It does not matter that the original transaction was not between [the borrower] and [the subsequent purchaser/servicer], because by purchasing the loan, [the subsequent purchaser/servicer] subjected itself to potential liability for its role in the alleged fraudulent scheme."); *Time Warner Entertainment v. Worldwide Electronics*, 50 F. Supp. 2d 1288 (S.D. Fla. 1999); *Nance v. Maxwell Fed. Credit Union*, 186 F.3d 1338 (11th Cir. 1999); *Sain v. Nagel*, 997 F. Supp. 1002 (N.D. Ill. 1998); *Tompkins v. Cyr*, 995 F. Supp. 664 (N.D. Tex. 1998). For liability to attach, the unlawful acts of the co-conspirators must have been foreseeable. *Williams v. Fedor,* 69 F. Supp.2d 649, 666 (M.D. Pa. 1999), *aff'd*, 211 F.3d 1263 (3d Cir. 2000).

In *Plascencia*, borrowers were unaware that their loan was subject to negative amortization. 583 F.Supp.2d at 1093–94. They brought action against the lender and the purchaser of their mortgage citing violations of the TILA as well as violations of California's statutory and common law in

13

1   connection with the sale of certain residential mortgage products. *Id.*[3]

2        The mortgage purchaser brought a motion to dismiss all causes of action, including the claim

3   for violations of California's unfair competition laws (UCL). *Id.* The court held that the claim should not

4   be dismissed, because, by showing that the subsequent mortgage purchaser purchased the original

5   lender's mortgage with knowledge of the lender's TILA violations, the plaintiffs could establish a

6   collusive agreement between the defendants:

7           Plaintiffs may be able to establish that [the subsequent purchaser] gave [the original lender] a
            financial incentive to continue to commit those violations, and therefore may be subjected to liability
8           for aiding and abetting violations of the [California Statute]. Moreover, [the subsequent mortgage
            purchaser]'s profiting from loans featuring oppressive terms that were not fully disclosed in
9           compliance with TILA could itself be an unfair business practice under the UCL.

10  *Plascencia*, 583 F. Supp. 2d at 1098.

11       *Plascencia* stands for the general idea that all parties in the mortgage chain, be they brokers,

12  lenders, or servicers are liable for the statutory violations and intentional torts committed in furtherance

13  of a conspiratorial scheme by any one of the parties in that chain. In this case, it is not clear at this point

14  whether Mortgage Capital acted as a broker to Mr. Jaime or just as a lender. Regardless, the persons with

15  whom Mr. Jaime dealt in purchasing the Anasazi Property made repeated representations that Mr. Jaime

16  would be able to afford the house and that he would be able to refinance the home within a short time.

17  Mr. Jaime was never told that the approval of his loans was based entirely on Mortgage Capital's wager

18  that his home would rapidly appreciate in value. As discussed more fully below, these

19  misrepresentations and omissions, regardless of who perpetrated them, form the basis for Plaintiff's

20  various claims which extend to BAC as a co-conspirator regardless of whether BAC's role was limited

21  to only that of a purchaser/servicer of the loans. As has previously been mentioned, Plaintiff will be able

22  to provide more specificity with regard to the civil conspiracy claim as more information becomes

23  available through discovery.

24       In this case, Plaintiff has sufficiently pled the elements of a civil conspiracy claim against

25  BAC. First, the Complaint adequately alleges that BAC either expressly, or impliedly through its

26

27       [3] It should be noted that the fact that plaintiffs relied on TILA as the basis for imposing a legal duty on the
    subsequent purchaser/servicer did not serve to preempt the state law claims. In fact, the court specifically rejected such
28  arguments made by the defendants. *Plascencia*, 583 F. Supp. 2d at 1100 ("Although [the subsequent purchaser/servicer]
    argues that this duty cannot serve as the basis for a common law fraud claim because such a claim would be preempted, the
    Court has already rejected this theory of preemption.")

1   conduct, agreed to conspire with the other Defendants. *See* Complaint [Dkt. 1] at ¶¶ 50–59, 139–48.

2   Second, BAC committed an overt act by purchasing/servicing Plaintiff's loans which it knew or should

3   have known was the product of the fraudulent and illegal conduct, or, at the very least, BAC knew or

4   should have known that Mr. Jaime could not repay the loan unless the home appreciated rapidly in value.

5   *Id.* Third, Plaintiff adequately alleges that he has suffered damages as a result of this conspiratorial

6   scheme (*e.g.,* loss of their home, damage to their credit, etc.). *Id.* at ¶¶ 59, 139-48.

7           BAC, as a purchaser and/or servicer of subprime mortgages, was engaged in an ongoing

8   conspiratorial scheme against homeowners just like Mr. Jaime. BAC's actions on their face might

9   appear to be legal; however, as *Hotel Riviera, Inc. v. Short* instructs, an otherwise lawful action taken by

10  an individual becomes unlawful when its natural and necessary consequence results in the oppression of

11  the public and individuals like Mr. Jaime. 80 Nev. at 512, 396 P.2d at 859-60. The conspiracy between

12  BAC and the other Defendants existed well before the closing on the Mr. People's predatorily procured

13  mortgage was finalized. BAC benefitted from this conspiracy by reaping short term profits made by

14  gambling on assumptions regarding the housing market that were never disclosed to Plaintiff.

15          The law requires that all Defendants be held accountable for all foreseeable unlawful acts made

16  in furtherance of this conspiracy. Thus, BAC is liable for all claims regarding fraud, constructive fraud,

17  consumer fraud, deceptive trade practices, and violations of NRS 598D, regardless of whether it had any

18  direct involvement with Plaintiff before or at closing. Plaintiff's Complaint sufficiently alleges BAC's

19  involvement in the conspiracy, and the involvement of all Defendants in the underlying unlawful

20  activities giving rise to the conspiracy. Accordingly, BAC's Motion to Dismiss should be denied.

21                  **3.      Consumer Fraud and Deceptive Trade Practices Claim**

22          Nevada Revised Statute 598.0915 provides, in pertinent part:

23                          A person engages in a "deceptive trade practice" if, in the course of his business or
                            occupation, he:

24                          [. . .]

25                          15. Knowingly makes any other false representation in a transaction.

26  NRS 598.0915 (2010). As discussed above, the parties who dealt with Mr. Jaime in closing on the

27  purchase of the Anasazi Property made several misrepresentations regarding the terms of the loans and

28

                                                          15

1  also regarding Mr. Jaime's ability to repay the loans. These false representations clearly fall under the

2  plain and unambiguous language of NRS 598.0915(15). Moreover, even if BAC did not make any

3  explicit misrepresentations to Mr. Jaime, BAC, as a co-conspirator with the broker and lender, would be

4  liable for the misrepresentations made to Mr. Jaime by those parties under the civil conspiracy doctrine.

5  *See supra* Part III.C.2.

6      Further, Defendant argues that Plaintiff's claim for deceptive trade practices fails because it is

7  not pleaded with sufficient particularity to meet the heightened standard required for claims of fraud. *See*

8  BAC's Motion to Dismiss [Dkt. 12], at p. 9.  Nevertheless, BAC's argument falls flat as the Supreme

9  Court of Nevada has recently held that NRS 598.0915(15) does not require a heightened pleading

10  standard for claims made under the statute. *See Betsinger v. D.R. Horton*, 126 Nev. 17, 232 P.3d 433

11  (2010) (citing *Mack v. Ashlock*, 112 Nev. 1062, 1066, 921 P.2d 1258, 1261 (1996)).

12      In *Betsinger*, the plaintiff, Betsinger, was quoted an agreeable interest rate by a builder's

13  lending division and, based upon the quoted rate, contracted to purchase a house with the builder. *Id.* at

14  __, 232 P.3d at 435. After placing down an earnest money deposit on the property, the lender notified

15  Betsinger that the rate would actually be nearly two full percentage points higher than was initially

16  represented. *Id.* Plaintiff rescinded the contract and sought a refund of his earnest money deposit, which

17  the lender refused to give. *Id*. At trial, a jury returned a verdict finding that the lender had engaged in

18  deceptive trade practices, and awarded compensatory, actual, and punitive damages. *Id*.

19      On appeal, the Supreme Court of Nevada held that the burden of proof for deceptive trade

20  practices was merely that of a preponderance of the evidence.  In so holding, the court stated that the

21  mere use of the word fraud does not create a higher standard:

22          [T]he mere fact that the word 'fraud' appears in the [. . .] consumer protection statute does
           not give rise to an inference that the legislature intended to require a higher degree of proof
23          than that ordinarily required in civil cases. [ . . .] [T]he purpose of the consumer protection
           statute [is] to provide consumers with a cause of action that [is] easier to establish than
24          common law fraud, and therefore, statutory fraud must only be proven by a preponderance
           of the evidence. Statutory offenses that sound in fraud are separate and distinct from
25          common law fraud. Therefore, we conclude that deceptive trade practices, as defined under
           NRS Chapter 598, must only be proven by a preponderance of the evidence.

26  *Id.* at __, 232 P.3d at 435–36 (internal quotations omitted). The Court further rejected the argument that
27  
28  deceptive trade practices actions are not applicable to actions concerning the purchase of real property,

1 | and upheld the district court jury's decision. *Id.*

2 | In light of *Betsinger*, BAC's arguments that Plaintiff has not pled his NRS 598.0915 claim with

3 | sufficient particularity are without merit. Defendants conspiratorial actions place them squarely within

4 | the purview of the statutory provisions, and, as such, Plaintiff's claim for deceptive trade practices

5 | should not be dismissed.

6 | ### 4.    Fraud, Constructive Fraud, and Negligent Misrepresentation Claims

7 | BAC's assertion that Plaintiff's Complaint fails the particularity requirement of Fed. R.

8 | Civ. P. 9(b) with regard to Plaintiff's Fraud, Constructive Fraus, and Negligent Misrepresentation claims

9 | is without merit. As stated previously herein, Plaintiff will demonstrate that BAC participated in a

10 | scheme to defraud Plaintiff. Indeed, BAC continued the scheme by acquiring and servicing a loan which

11 | it knew, or should have known, was premised upon information which was falsely supplied by the

12 | original lender and broker.

13 | In his Complaint, Plaintiff makes the following allegations with respect to the fraudulent

14 | actions of BAC:

15 |
16 | -    Plaintiff entered into an agreement of special confidence with Defendants, who agreed to help Plaintiff find an appropriate loan on the Property. (*See* Complaint ¶ 23).

17 |
18 | -    Defendants knew Plaintiff was relying upon the superior knowledge and expertise of Defendants to qualify for the loan.(*See* Complaint ¶ 24).

19 | -    Defendants shopped for a loan based upon economic compensation that favored Defendants, not Plaintiff. (*See* Complaint ¶ 26).

20 |
21 | -    Defendants did not convey to Plaintiff material information about other loans that were available to be applied for, and/or what the economic compensation to Defendants would be under the other loans.(*See* Complaint ¶ 27).

22 |
23 | -    Defendants created and submitted to the lender containing statements of material fact about Plaintiff which were erroneous and which omitted known factual information about Plaintiff. (*See* Complaint ¶ 28).

24 |
25 | -    Prior to purchasing the mortgage loan, defendants knew or reasonably should have known that Mr. Jaime was likely to default on his obligations under the loan agreement. (*See* Complaint ¶ 34).

26 |
27 | -    Plaintiff was not fully and properly informed of the material provisions of the transaction, including the loan terms, consequences of entering into the loan, reasonably available alternatives to the loan offered, and his rights of
28 |      rescission.(*See* Complaint ¶ 37).

1

2      It is Plaintiff's belief and understanding that, after the incorrect and incomplete Uniform

3  Residential Loan Application was prepared, approved, and signed, no efforts were made by any of the

4  Defendants, including BAC as a subsequent purchaser and/or servicer, to verify any of the information

5  therein or question the blatant defects on the face of the documents, despite the fact that Defendants held

6  themselves out to Plaintiff as having superior knowledge of credit scores, debt to income ratios, loan

7  types, and other information necessary to determine the suitability of a particular loan. Notwithstanding

8  such, BAC failed to verify any of the false and inconsistent information on the face of the documents,

9  despite the fact that Plaintiff supplied the original lender with documents to verify his income, debt to

10 income ratio, and net worth. Had BAC actually reviewed Plaintiff's monthly income prior to acquiring

11 and/or servicing the Loans, it would have known Plaintiff was not earning the amount stated on the loan

12 documents, and that their personal assets were far lower than those represented on the loan application,

13 and that, in reality, they did not qualify for the Loans.

14     At the time Mr. Jaime sought financing from Mortgage Capital he was making $3,500.00 a

15 month and owned two other mortgage-encumbered properties. *See Aff. of Jaime* at ¶¶ 1–5. The note for

16 the First Mortgage contained variable terms regarding the interest rate and monthly payments. *See*

17 **Exhibit "2."** These provisions resulted in Mr. Jaime initially paying an amount which would not even

18 reduce the total amount owed under the loan, followed by the monthly payment adjusting up to

19 $2,200.00 a month at the time of his default. *See Aff. of Jaime* at ¶ 11. The person who represented to

20 Mr. Jaime that he could afford the mortgage defrauded him. BAC, whether it made the fraudulent

21 representations or not, is liable for the harm caused to Mr. Jaime as a result of its involvement in this

22 civil conspiracy to defraud him. *See supra* Part III.C.2.

23     Of course, at this time, Plaintiff is not in possession of any documentation from BAC to

24 substantiate (or refute, as the case may be) what was done to verify any of the information contained on

25 the loan application documents or to determine whether Plaintiff was qualified to enter into the loan.

26 Thus, discovery is needed on this issue to more fully flesh out the bases for the fraud claims.

27     The Ninth Circuit Court of Appeals has previously held that Rule 9(b) requires that the

28 "allegations of fraud are specific enough to give defendants notice of the particular misconduct which is

18

1    alleged to constitute the fraud charged so that they can defend against the charge and not just deny that

2    they have done anything wrong. *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (citing *Semegen*

3    *v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)). A pleading "is sufficient under Rule 9(b) if it identifies

4    'the circumstances constituting fraud so that the defendant can prepare an adequate answer from the

5    allegations.'" *Id.* at 672 (quoting *Gottreich v. San Francisco Investment Corp.*, 552 F.2d 866 (9th Cir.

6    1977)).

7         As previously discussed above, in *Ozuna v. Home Capital Funding*, No. 08cv2367-IEG-AJB,

8    2009 WL 2496804 (S.D. Cal. Aug. 13, 2009), the plaintiff brought an action against Home Capital

9    Funding, the original lender; the mortgage broker; and Countrywide Home Loans, the subsequent

10    purchaser and servicer of the loan, for violations of state and federal laws. The plaintiff alleged that

11    Home Capital and the mortgage broker made misrepresentations concerning the interest rate and other

12    material terms of the loan, and failed to make required disclosures.

13         Countrywide filed a motion to dismiss the plaintiff's claims, arguing that as an assignee, it

14    could not be liable for "violations on the face of the documents."[4] *Id.* at 2. The United States District

15    Court for the Southern District of California held that a subsequent assignee of a creditor, or servicer of a

16    loan, is liable for any violation or defect apparent on the face of the document, including failures to

17    disclose. *Id.* at 3. The court reasoned that the plaintiff alleged that the defendants failed to make several

18    disclosures and other violations, which were apparent on the face of the plaintiff's loan documents. *Id.*

19         Here, BAC's conduct and actions are similar to those made by the purchser and servicer in

20    *Ozuna*. Plaintiff allege that BAC knew that the loan documents had multiple defects, inconsistencies,

21    and false statements apparent on their face, and BAC acquired the loan and/or serviced the loan in spite

22    of this. Contrary to BAC's argument, it directly approved, ratified, and participated in the defrauding of

23    Plaintiff.

24         As outlined above, Plaintiff has pleaded his fraud claim with enough particularity to give BAC

25    notice of the particular misconduct that is alleged to constitute fraud to enable BAC to defend against the

26    claim and to prepare an adequate answer. The above-noted particularity aside, it must be noted that the

27    federal courts use relaxed pleading requirements when facts necessary for the plaintiff to plead a cause

28

      [4]    This argument is, of course, similar to the one BAC is asserting in the instant case.

of action for fraud with particularity under Fed. R. Civ. P. 9(b) are peculiarly within the defendants' knowledge or possession. *Neubronner v. Milken*, 6 F.3d 666 (9th Cir.1993). As stated above, Plaintiff is not currently in possession of the original loan files from any of the Defendants and, therefore, cannot verify the information contained on the loan application documents or determine what actions were taken by Defendants either at the time of the loan origination or at the time that BAC acquired and/ore serviced the Loans. Consequently, discovery is needed on this issue to more fully flesh out the bases for the fraud claims. Therefore, if this Court believes that Plaintiff did not plead the fraud claims with enough particularity, then leave should be granted to allow Plaintiff to amend the fraud claims after some discovery is completed and Plaintiff is provided copies of the original loan files and an opportunity to inquire as to the actions taken by BAC.

Similar to its assertions regarding the fraud and constructive fraud claims, BAC asserts Plaintiff's claim for negligent misrepresentation fails because BAC did not deal directly with Plaintiff and therefore could not have made any representations. Nevertheless, in acquiring and servicing the loan, BAC was implicitly representing that it had sufficiently investigated the financial reports and the financial documentation provided with the applications for the Loans, and further representing that Plaintiff possessed the financial qualifications necessary to qualify for the monthly mortgage obligations. In both instances, those representations were untrue. As part of the loan transaction, Mortgage Capital, and subsequently, BAC by way of assignment, made representations regarding Plaintiff's financial qualifications upon which they relied, and which reliance ultimately lead to the suffering of financial and emotional damages. Accordingly, Plaintiff respectfully requests that BAC's motion to dismiss this claim be denied.

## 5. Negligence.

BAC attacks Plaintiff's negligence and constructive fraud claims by arguing that loan servicers owe absolutely no duty to borrowers. Under Nevada law, "[a] fiduciary relationship is deemed to exist when one party is bound to act for the benefit of the other party. Such a relationship imposes a duty of the utmost good faith." *Giles v. GMAC*, 494 F.2d 865 (9th Cir. 2007) (citing *Hoopes v. Hammargren*, 102 Nev. 425, 725 P.2d 238, 242 (1986)). In *Mackintosh v. Jack Matthews Co.*, 109 Nev. 628, 855 P.2d 549 (1993), the Nevada Supreme Court found that a special relationship exists in mortgage transactions,

1  which gives rise to a duty to disclose, such that "nondisclosure will become the equivalent of fraudulent
2  concealment when it becomes the duty of the person to speak in order that the party with whom he is
3  dealing may be placed on an equal footing with him. The duty to speak does not necessarily depend on
4  the existence of a fiduciary relationship" *Id.* at 634–35, 855 P.2d at 553 (quoting *Central States*
5  *Stamping Co. v. Terminal Equipment Co.*, 727 F.2d 1405, 1409 (6th Cir. 1984)). The Nevada Supreme
6  Court further held that such "may arise in any situation where one party imposes confidence in the other
7  because of that person's position, and the other party knows of this confidence." *Id.* The *Mackintosh*
8  opinion established the two-pronged "special relationship" test which requires: (1) a finding by the jury
9  that the conditions surrounding the transaction are such that only a reasonable person would "impart
10 special confidence" in the lender, and (2) a finding by the jury that a reasonable lender would have
11 known of this confidence. *Id.* Additionally, the court found that the lender should have known about the
12 "confidence" which had been placed in the lender by the borrowers even though no direct
13 communication had taken place between the lender and borrowers during the loan origination process.
14 *Id.* at 402–03, 935 P.2d at 1160.

15       In the present case, the facts, as pleaded, establish that the mortgage broker acted as an agent of
16 Mortgage Capital, and thus, by assignment, acted as an agent for the subsequent purchasers and/or
17 servicers as well. Plaintiff relied on the expertise of the mortgage broker, lenders and subsequent
18 purchasers and servicers, and trusted them to ensure that he was protected from any fraudulent or
19 wrongful lending practices. Plaintiff further trusted that Defendants brokered, made, acquired, and
20 serviced a loan which Plaintiff would be able to repay. In doing so, a special relationship was created
21 between Plaintiff and the Defendants. Moreover, BAC, relying on the documents falsified by the
22 mortgage broker and without any investigation into the information contained on the same, acquired,
23 serviced, and collected on a Loan which should never have been made in the first place. In doing so,
24 BAC held itself out as an entity with superior knowledge and experience, and one that would protect the
25 interests of the people whose loans it was servicing. As a result a special relationship was established,
26 and BAC had a duty to fully inform Plaintiff and disclose all inaccurate and/or fraudulent information
27 contained on the documents for the Loan. BAC breached that duty, and as a direct result of the breach,
28 Plaintiff has suffered economic, social, and emotional damages.

1    BAC also argues that Plaintiff's damages are purely economic, and therefore her negligence

2  claim is barred by the economic loss doctrine. This assertion is invalid, as Plaintiff does not assert that

3  all damages flow from the contractual breach in this case. In fact, Plaintiff has separate and distinct

4  causes of action against Defendants which sound in tort, in contract, and some in both.

5    The Nevada Supreme Court defines a "purely economic loss" as "the loss of the benefit of the

6  user's bargain . . . including . . . pecuniary damage for inadequate value, the cost of repair and

7  replacement of [a] defective product, or a consequent loss of profits, without any claim of personal

8  injury or damage to other property." *Terracon Consultants Western, Inc. v. Mandalay Resort Group*, 206

9  P.3d 81, 83 (Nev. 2009).

10    Contrary to BAC's argument, Mr. Jaime has suffered severe personal and emotional injury as a

11  result of the wrongful actions by BAC and other Defendants.  These actions did not arise out of a

12  contract dispute, but out of Defendants' fraudulent actions against Plaintiff.  Additionally, Plaintiff has

13  lost the Property via foreclosure sale.  As real property is unique, such a loss is not purely economic.

14  BAC seemingly ignores the emotional turmoil which Plaintiff suffered as a result of BAC's actions.

15  BAC's negligence has certainly worsened Plaintiff's financial state.  However Plaintiff has also suffered

16  mental anguish, pain and suffering.  To ignore the emotional and social effects of BAC's actions and

17  claim Plaintiff's losses are purely economic is both unrealistic and unfair.

18    As such, Plaintiff's claims for negligence and constructive fraud should not be dismissed as the

19  Complaint provides sufficient notice to Defendants, and the claims have a valid legal basis.

20    **E.  Defendants' Motion to Dismiss is a Thinly-Veiled Motion for More Definite
     Statement.**

21    Fed. R. Civ. P. 12 (e) provides:

22        A party may move for a more definite statement of a pleading to which a
23        responsive pleading is allowed but which is so vague or ambiguous that the
          party cannot reasonable prepare a response.  The motion must be made
24        before filing a responsive pleading, and must point out the defects
          complained of and the details desired.

25  FRCP 12(e). BAC has filed a motion to dismiss alleging a lack of specificity with regards to several of

26  Plaintiff's claims previously addressed in this Response. The gist of much of the motion to dismiss is

27  really that Plaintiff should provide more specific information. However, rather than file an appropriate

28

1    motion for more definite statement, BAC has attempted to circumvent the Rule 12(e) process by simply

2    moving to dismiss the claims for which it allegedly needs more information.   Plaintiff respectfully

3    requests that this Court treat those claims for which BAC seeks a dismissal based upon an alleged lack

4    of information as a motion for more definite statement with regard to those claims, thus allowing

5    Plaintiff the opportunity to provide the court-ordered specifics.

6    **III.    CONCLUSION**

7        BAC's insistence that it had nothing to do with the wrongs from which Plaintiff has suffered is

8    disingenuous, and ignores the legal obligations and duties BAC accepted when it acquired and/or

9    serviced the Loans.  Accordingly, and as Plaintiff has pleaded his causes of action with sufficient

10   specificity to both satisfy the pleading standard, Plaintiff respectfully requests that the Court deny BAC's

11   motion to dismiss as to all claims.  In the alternative, Plaintiff requests that the Court treat BAC's

12   Motion to Dismiss as a Motion for More Definite Statement, and give Plaintiff the opportunity to

13   provide the more specific information requested by ths Court.

14       DATED  this 26th day of October, 2010.

15                                                    HALL JAFFE & CLAYTON, LLP

16

17                                                    By  /s/ Jacob S. Smith
                                                         MICHAEL R. HALL
18                                                       Nevada Bar No. 005978
                                                         STEVEN T. JAFFE
19                                                       Nevada Bar No. 007035
                                                         JACOB S. SMITH
20                                                       Nevada Bar No. 010231
                                                         7455 West Washington Avenue, Suite 460
21                                                       Las Vegas, Nevada 89128
                                                         *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

Pursuant to F.R.C.P. 5(b), I hereby certify that service of the foregoing **OPPOSITION TO**

3

**DEFENDANT BAC HOME LOAN SERVICING, LP'S MOTION TO DISMISS** was made this

4

26TH day of October, 2010, via electronic service to the following:

5

6
J. Christopher Jorgensen, Esq.
LEWIS AND ROCA, LLP

7
3993 Howard Hughes Pkwy., Ste 600
Las Vegas, NV 89169
*Attorneys for BAC Home Loans Servicing, LP*

8

9
G. Dallas Horton, Esq.
G. DALLAS HORTON & ASSOCIATES
4435 S. Eastern Avenue

10
Las Vegas, NV 89119
*Attorneys for Plaintiff*

11

12
Robert D. Vannah, Esq.
VANNAH & VANNAH
400 S. Fourth Street, 6th Floor

13
Las Vegas, NV 89101
*Attorneys for Plaintiff*

14

15

16
_____
An Employee of

17
HALL JAFFE & CLAYTON, LLP

18

19

20

21

22

23

24

25

26

27

28

24

**AFFIDAVIT OF ARIEL JAIME**

STATE OF NEVADA      )
                     ) SS:
COUNTY OF CLARK      )

ARIEL JAIME, being first duly sworn, deposes and says:

1. On or about May 25, 2005, I purchased a property located at 8528 Caladium Court, Las Vegas, Nevada, 89149, also known by Clark County Assessor Parcel number 125-20-712-011, (hereinafter "the Caladium Property"). At the time I purchased the Caladium Property, I already owned a home in Valencia, California, which was my primary residence.

2. I purchased the Caladium Property for my sister who was living in Las Vegas, Nevada at the time. It was agreed that I would purchase the home, and my sister would pay me rent equal to the monthly mortgage payment.

3. Sometime in or near October of 2006, I received a job offer in Las Vegas, Nevada, to work as a Spanish-English translator. I accepted the job offer and began making arrangements to move to Las Vegas.

4. I put my home in Valencia, California, up for sale and began looking for a home to purchase in Las Vegas. However, I had difficulty selling the home, so I began renting the house and using the rental income to cover most of the monthly mortgage payments.

5. On or near December 29, 2006, I purchased a home located at 8039 Anasazi Ranch Avenue, Las Vegas, Nevada 89131, known by Clark County Assessor Parcel number 125-21-211-035 (hereinafter "the Anasazi Property"). At the time I purchased the home I was making approximately $3,500.00 per month.

6. In order to finance the purchase of the Anasazi Property, I contacted a mortgage broker; however, at this time, I am without sufficient knowledge and documentation to verify the identity of the broker. His name was Fernando and he had previously helped me refinance my home in Valencia. I am not sure whether Fernando was an employee of Mortgage Capital Associates, Inc., or whether he represented a mortgage brokerage.

7. During the loan application process, I was asked only general questions regarding my income, *e.g.*, "How much do you make a month?" I never personally filled out any loan application documents, but later signed those documents when they were presented to me already filled out. At no time during the application process was I ever questioned about the fact that I owned two other properties.

8. In deciding to purchase the Anasazi property, I relied on the representations made by the mortgage broker regarding my ability to afford the monthly mortgage payments. I knew how much I could afford at that time with respect to the monthly payment, but I did not, and do not, have sufficient knowledge and understanding regarding, for example, the variable interest rate provisions to have been able to know whether I would be able to afford the purchase of a home under such terms in the future.

9. Thus, when I was told by the mortgage broker that my monthly payment would be approximately $1,200.00, I believed that I would be able to make the monthly mortgage payments given my income at the time. However, I could not anticipate how my ability to repay on the loans would be affected in the event that the monthly payment changed. It was for this reason that I relied on the mortgage broker's representations regarding my ability to afford the home in deciding to go through with the purchase of the property.

10. At the closing of the Anasazi Property, which occurred on or near December 29, 2006, I was not informed that the mortgage contained provisions making it an adjustable-rate, interest only, negative amortization mortgage.

11. The initial payment on the loans was approximately $1,200.00 per month, but that amount increased to $2,200.00 near the time I defaulted on the house in August of 2009. None of the terms of the loans were explained to me. I was simply told to "sign here, here, and here," without ever being told what I was signing. Whenever I voiced any concern I was told "not to worry about it," and that I "could always refinance" if it became too difficult for me to make the mortgage payments. To that end, however, it was never explained to me that if I were to refinance the property that I would have to pay a prepayment penalty to the lender.

12. I managed to make the payments on the mortgage for more than two years, even though the job offer which initially brought me to Las Vegas fell through. With the collapse of the economy, my

2

1   sister and the renters living in my home in Valencia, found that they were unable to make the rental
2   payments to me as they had come under difficult financial times.

3       13.    I could not afford the mortgage payments on the Valencia and Caladium Properties, as I
4   was having difficulty making the payments on the Anasazi Property as well. Refinancing the properties
5   was not an option since the value of the homes was worth far less than what I owed on them. Faced with
6   the burden of this insurmountable debt, I determined that my only recourse was to let the properties go
7   into foreclosure and seek protection under bankruptcy.

8       14.    On September 16, 2008, I filed for bankruptcy. A short time prior to filing for bankruptcy,
9   I met with a bankruptcy attorney. During my meeting with him, I first became aware of the predatory
10  lending practices that were perpetrated by the broker/lender with respect to the purchase of the Anasazi
11  Property.

12      15.    The bankruptcy attorney could not understand how I was able to receive financing for the
13  $362,803.00 Anasazi Property even though I only made $3,500.00 a month at the time, and already
14  owned two other properties. After our meeting, I reviewed the closing documents and realized that the
15  mortgages for the Caladium and Anasazi Properties both contained terms—*e.g.*, variable interest rate,
16  interest only amortization schedule, prepayment penalty provision, etc.—that I had never heard of and
17  would not have agreed to had I been informed of them.

18

19  FURTHER YOUR AFFIANT SAYETH NAUGHT.

20      Dated this __/ß__ day of October, 2010.

21

22

23

24      ARIEL JAIME

SUBSCRIBED and SWORN TO before me
24  this __/ß ²⁴__ day of October, 2010.

25

26  Notary Public in and for
27  said County and State

28

NOTARY PUBLIC
**DONNA N. BIBY**
STATE OF NEVADA - COUNTY OF CLARK
MY APPOINTMENT EXP. JULY 27, 2013
No: 01-71227-1

# EXHIBIT 1

**Search Results**

Searched for Parcel Id that **Begins with '125-21-211-035'**
**You must login to purchase documents.**

 Click Here to Login.

1

| [row] | First Party Name | First Cross Party Name | Instrument # | Document Type | Modifier | RecordDate | Parcel # | Remarks | Total Value |
|---|---|---|---|---|---|---|---|---|---|
| 1 | RICHMOND AMERICAN HOMES OF NEVADA INC | RICHMOND AMERICAN HOMES | 200612290001459 | NOTICE | COMPLETION | 12/29/2006 | 125-21-211-035 | | $0.00 |
| 2 | RICHMOND AMERICAN HOMES OF NEVADA INC | JAIME, ARIEL | 200612290001460 | DEED | | 12/29/2006 | 125-21-211-035 | | $362,803.00 |
| 3 | JAIME, ELOISA | JAIME, ARIEL | 200612290001461 | DEED | | 12/29/2006 | 125-21-211-035 | | $0.00 |
| 4 | JAIME, ARIEL | MORTGAGE CAPITAL ASSOCIATES INC | 200612290001462 | DEED OF TRUST | | 12/29/2006 | 125-21-211-035 | | $0.00 |
| 5 | JAIME, ARIEL | MORTGAGE CAPITAL ASSOCIATES INC | 200612290001463 | DEED OF TRUST | | 12/29/2006 | 125-21-211-035 | | $0.00 |
| 6 | JAIME, ARIEL | LAS VEGAS CITY | 200903200004942 | LIEN | | 3/20/2009 | 125-21-211-035 | | $0.00 |
| 7 | JAIME, ARIEL | CIMARRON RIDGE ASSOCIATION | 200907010001849 | LIEN | | 7/1/2009 | 125-21-211-035 | | $0.00 |
| 8 | JAIME, ARIEL | RECONTRUST COMPANY NA | 200908140003844 | DEFAULT & ELECTION TO SELL | | 8/14/2009 | 125-21-211-035 | | $0.00 |
| 9 | MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC | BAC HOME LOANS SERVICING LP | 200909010001002 | ASSIGNMENT | | 9/1/2009 | 125-21-211-035 | | $0.00 |
| 10 | JAIME, ARIEL | CIMARRON RIDGE ASSOCIATION | 200909040002058 | DEFAULT | | 9/4/2009 | 125-21-211-035 | | $0.00 |
| 11 | RECONTRUST COMPANY NA AGT | JAIME, ARIEL | 200910230002351 | DEFAULT | RESCISSION | 10/23/2009 | 125-21-211-035 | | $0.00 |
| 12 | ARIEL, JAIME | REPUBLIC SERVICES | 201002020004166 | LIEN | | 2/2/2010 | 125-21-211-035 | | $0.00 |
| 13 | JAIME, ARIEL | CIMARRON RIDGE ASSOCIATION | 201002250001463 | NOTICE | SALE | 2/25/2010 | 125-21-211-035 | | $0.00 |
| 14 | JAIME, ARIEL | RECONTRUST COMPANY NA | 201003010002965 | DEFAULT & ELECTION TO SELL | | 3/1/2010 | 125-21-211-035 | | $0.00 |
| 15 | REGISTRATION SYSTEMS | BAC HOME LOANS SERVICING LP | 201003050001294 | ASSIGNMENT | | 3/5/2010 | 125-21-211-035 | | $0.00 |
| 16 | JAIME, NEVADA ARIEL | RECONTRUST COMPANY NA | 201003050001295 | SUBSTITUTION | TRUSTEE | 3/5/2010 | 125-21-211-035 | | $0.00 |
| 17 | ARIEL, JAIME | LAS VEGAS CITY | 201003180004359 | LIEN | | 3/18/2010 | 125-21-211-035 | | $0.00 |
| 18 | CIMARRON RIDGE ASSOCIATION | JAIME ARIEL | 201005100001516 | LIEN | RELEASE | 5/10/2010 | 125-21-211-035 | | $0.00 |
| 19 | CIMARRON RIDGE ASSOCIATION | JAIME ARIEL | 201005100001297 | DEFAULT | RESCISSION | 5/10/2010 | 125-21-211-035 | | $0.00 |
| 20 | ARIEL, JAIME | REPUBLIC SERVICES | 201007220002017 | LIEN | | 7/22/2010 | 125-21-211-035 | | $0.00 |

| 21 | JAIME, ARIEL | RECONTRUST COMPANY NA | 201008130002917 | CERTIFICATE FORECLOSURE MEDIATION NEVADA | | 8/13/2010 | 125-21-211-035 | $0.00 |
| 22 | JAIME, ARIEL | RECONTRUST COMPANY NA | 201008130002918 | NOTICE OF TRUSTEE SALE | | 8/13/2010 | 125-21-211-035 | $0.00 |
| 23 | LAS VEGAS CITY | ARIEL JAIME | 201009100000880 | LIEN | RELEASE | 9/10/2010 | 125-21-211-035 | $0.00 |
| 24 | LAS VEGAS CITY | ARIEL JAIME | 201009240001923 | LIEN | RELEASE | 9/24/2010 | 125-21-211-035 | $0.00 |

1

# EXHIBIT 2

The undersigned hereby certifies
this to be a [ ] and correct copy
of the original document.
STEWART TITLE OF NEVADA

MIN: 1001330-0100057088-3   By ___Loan Number: 06-120109

# ADJUSTABLE RATE NOTE

(12-Month Average Yield On Actively Traded U.S. Treasury Securities - Rate Caps)

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN
ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY
ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE
MAXIMUM RATE I MUST PAY. THIS NOTE ALLOWS MONTHLY RATE CHANGES
AND ANNUAL PAYMENT CHANGES. THIS NOTE ALLOWS ME TO CAP MY
PAYMENTS. THIS NOTE MAY REQUIRE UNPAID INTEREST TO BE ADDED TO
LOAN PRINCIPAL AND REQUIRE ME TO PAY ADDITIONAL INTEREST ON THE
UNPAID INTEREST (NEGATIVE AMORTIZATION).

DECEMBER 14, 2006        WEST LOS ANGELES        CALIFORNIA
   [Date]                     [City]                [State]

    8039 ANASAZI RANCH AVENUE, LAS VEGAS, NEVADA 89131
                      [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 290,242.00        (this amount is
called ("Principal"), plus interest, to the order of Lender. Lender is MORTGAGE CAPITAL
ASSOCIATES, INC., A CALIFORNIA CORPORATION
I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest
at a yearly rate of     1.000 %. The interest rate I will pay may change in accordance with Section 4 of this
Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after
any default described in Section 8(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the  1st  day of each month beginning on FEBRUARY
2007    . I will make these payments every month until I have paid all of the principal and interest and
any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its
scheduled due date and will be applied to interest before Principal. If, on JANUARY 1, 2037   ,
I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at 11150 WEST OLYMPIC BOULEVARD, #1160,
WEST LOS ANGELES, CALIFORNIA 90064
                                    , or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 933.53        . This amount
may change.

BAC Jaime-Anasazi 00412

Uv4004.mnc.1.tcn

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 and Section 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE

**(A) Interest Rate Change Dates**

The interest rate I will pay will change on the 1st   day of FEBRUARY, 2007          , and the adjustable interest rate I will pay may change on that day every month thereafter. The date on which my interest rate changes is called an "Interest Rate Change Date."

**(B) The Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 125/1000                    percentage points (      3.125 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

**(D) Limits on Interest Rate Changes**

My interest rate will never be greater than          9.950 %. My interest rate will never be lower than    3.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date.

## 5. PAYMENT CHANGES

**(A) Payment Change Dates**

My monthly payment may change as required by Section 5(B) below beginning on the 1st    day of FEBRUARY, 2008          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 5(D) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment. If the Minimum Payment is not sufficient to cover the amount of the interest due, then any accrued but unpaid interest will be added to Principal and will accrue interest at the rate then in effect. This practice is known as negative amortization. I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 5(D) below.

**(B) Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 5(D), 5(E), or 5(F) apply, the amount of my new monthly payment on a Payment Change Date will not exceed my prior monthly payment by more than 7.5%. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the

DocMagic *eForms* 800-649-1362
www.docmagic.com

BAC Jaime-Anasazi 00413

amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 5(D) or 5(E) below require me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment or to select an alternate payment amount as described in Section 5(F) below.

### (C) Additions to My Unpaid Principal

Because my monthly payment amount changes less frequently than the interest rate, and because the monthly payment is subject to the 7.5% Payment Cap described in Section 5(B), my monthly payment could be less than or greater than the amount of interest owed each month. For each month that my monthly payment is less than the interest owed, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4, above. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal.

### (D) Limit on My Unpaid Principal; Increased Minimum Payment

My unpaid Principal can never exceed the Maximum Limit equal to    115,000 % of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, my monthly payment will be adjusted to the Full Payment. My new monthly payment until the next Payment Change Date will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

This means that my monthly payment may change more frequently than annually. Payment changes required under this Section will not be limited by the 7.5% Payment Cap described in Section 5(B), above.

### (E) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

### (F) Additional Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

(i)    **Interest Only Payment:** Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   **Fully Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  **15 Year Amortized Payment:** Pay the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

### (G) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 6.  BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

DocMagic ℰℱℴℛℳℛ 800-649-1362
www.docmagic.com

BAC Jaime-Anasazi 00414



I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 7. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 8. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 9. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

MULTISTATE ADJUSTABLE RATE NOTE
MTA-TWELVE MONTH AVERAGE INDEX
BSR4004 10/06/06                                             Page 4 of 6

DocMagic €Forms 800-649-1362
www.docmagic.com

UN4004.evo.4.tem

BAC Jaime-Anasazi 00415

## 11. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 12. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



MULTISTATE ADJUSTABLE RATE NOTE
MTA-TWELVE MONTH AVERAGE INDEX
BSR4004 10/06/05

Page 6 of 6

DocMagic *EFrams* 800-649-1362
www.docmagic.com

BAC Jaime-Anasazi 00416

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
ARIEL JAIME                    -Borrower                                      -Borrower


_____ (Seal)        _____ (Seal)
                               -Borrower                                      -Borrower


_____ (Seal)        _____ (Seal)
                               -Borrower                                      -Borrower


*[Sign Original Only]*

BAC Jaime-Anasazi 00417



---------------------------- [Space Above This Line For Recording Data] ----------------------------

Loan Number: 06-120424

# BALLOON RIDER

THIS BALLOON RIDER is made this **14th** day of **DECEMBER 2006** , and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Note (the "Note") to MORTGAGE CAPITAL ASSOCIATES, INC., A
CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

8039 ANASAZI RANCH AVENUE, LAS VEGAS, NEVADA 89131
[Property Address]

The interest rate stated on the Note is called the "Note Rate." The date of the Note is called the "Note
Date." I understand the Lender may transfer the Note, Security Instrument and this Rider. The Lender or
anyone who takes the Note, the Security Instrument and this Rider by transfer and who is entitled to receive
payments under the Note is called the "Note Holder."

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements in the Security
Instrument, Borrower and Lender further covenant and agree as follows (despite anything to the contrary
contained in the Security Instrument or the Note):

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE
PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS
UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL,
THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY
OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE
THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN
AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS
NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM
THE SAME LENDER.**

---

MULTISTATE BALLOON RIDER
04/28/04                                    Page 1 of 2                          DocMagic *eFormz* 800-649-1362
                                                                                 www.docmagic.com

BAC Jaime-Anasazi 00418

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Balloon Rider.

_____  12/15/06    _____
Borrower ARIEL JAIME    Date    Borrower    Date


_____    _____
Borrower    Date    Borrower    Date


_____    _____
Borrower    Date    Borrower    Date

BAC Jaime-Anasazi 00419

# EXHIBIT 3

The undersigned hereby certifies
this to be true and correct copy
of the original document.
STEWART TITLE OF NEVADA
By_____

MIN: 1001330-0100057089-1    **NOTE**    Loan #:    06-1204 24

**THIS NOTE IS A CONTRACT FOR A SHORT-TERM LOAN. THIS LOAN IS PAYABLE IN FULL AT MATURITY. SINCE YOU HAVE SELECTED A PAYMENT SCHEDULE WHICH WILL NOT PAY THE LOAN IN FULL BY THE MATURITY DATE, YOU WILL NEED TO PAY A LUMP SUM, OR BALLOON PAYMENT, WHICH WILL PAY OFF THE ENTIRE AMOUNT OF THE PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOUR INTEREST RATE AND TERMS WILL BE AT THE PREVAILING INTEREST RATE, WHICH MAY BE CONSIDERABLY HIGHER THAN THE INTEREST RATE ON THIS LOAN. YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

DECEMBER 14, 2006              WEST LOS ANGELES          .       CALIFORNIA
      Date                              City                              State


        8039 ANASAZI RANCH AVENUE, LAS VEGAS, NEVADA 89131
    Property Address                    City                    State        Zip Code


### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 36,280.00          (this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

### 2. INTEREST

I will pay interest at a yearly rate of          9.000 %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

### 3. PAYMENTS

I will pay principal and interest by making payments each month of U.S. $ 291.92
I will make my payments on the     1st     day of each month beginning on FEBRUARY 1,
2007          . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on     JANUARY 1,
2022     , I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at   11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064
                                    or at a different place if required by the Note Holder.

### 4. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of    10
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
          5.000 % of my overdue payment, but not less than U.S. $ N/A
and not more than U.S. $ N/A                    . I will pay this late charge only once on any late payment.

NEVADA - SECOND MORTGAGE - 1/80
Document Systems, Inc. (800) 649-1362                    Page 1 of 3                    Form 75(NV) Rev. 7/97

BAC Jaime-Anasazi 00409

### (B) Notice From Note Holder

If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.

### (C) Default

If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (D) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 5. THIS NOTE SECURED BY A DEED OF TRUST

In addition to the protections given to the Note Holder under this Note, a Deed of Trust, dated DECEMBER 14, 2006           , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Deed of Trust describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

## 6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

## 7. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

## 8. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

BAC Jaime-Anasazi 00410

NV30123.ms

## 9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| ARIEL JAIME -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

NEVADA - SECOND MORTGAGE - 1/80
Document Systems, Inc. (800) 649-1362

Page 3 of 3

Form 75(NV) Rev. 7/97

BAC Jaime-Anasazi 00411

# EXHIBIT 4

you happen to come up with that language, where it is three times the amount of any actual damages sustained by the borrower and if the borrower brings an action? I just wondered how you came up with that. Is that punitive enough, along with what normally happens in court?

## Assemblywoman Buckley:

Yes, line 37 limits this to willful behavior and it is a treble damages section, which is similar to the one that we heard in Assemblyman Oceguera's bill just the other day, for intellectual property violation. It is an alternative to punitive damages. It is fairly common with more willful violations of the law. Just getting the persons money back is not enough. We want to really stop these practices. It is similar, in a way, to our caps on punitive damages under Nevada law, because we also in those sections have a three times capped, when we cap them in the 90s.

## Ken Scruggs:

Subprime lending is the subject we are talking about. A subprime borrower, by definition, is somebody who is not a prime borrower. That means that they have had some credit problems in the past, they do not have a job history that would make them prime, or they have an irregular or difficult-to-verify income stream. That makes them subprime. Legislatures around the country have been looking at these people because they do not have the wide variety of lenders to choose from that the prime borrowers do have. It is felt that it is proper public policy to place special regulations on subprime lenders to ensure that their borrowers are given a fair shake, that they understand what is going on in the transaction, and that they are fully and properly disclosed to.

This is not an easy area to regulate because, if you think about it, prime borrowers are those who exceed a certain standard. Everybody is pretty much alike, although some have a lot more money than others. Everybody is pretty good. Subprime is everybody else. We have subprime borrowers who are near prime, who are going to be prime next year, and are back on the way up. We have borrowers who are never going to see prime through the course of their lives.

[Mr. Scruggs, continued] Trying to regulate so that we protect the borrower who really does not understand the process very well and is struggling, yet not inhibit the borrower who is near prime or is on his way up, that is the challenge for you. To add to the problem, subprime lending has kind of blossomed over the last few years. Many of the lenders that offer subprime loans are not depository institutions, and as non-depositories, they have not, until very recently, been required to provide data on their customers to the federal government through HMDA (Home Mortgage Disclosure Act).

To further complicate the issue, since we are dealing with civil rights issues here in many cases [because of] the information that needs to be divulged, subprime lenders have been prohibited from collecting the kind of data that is needed to give a full picture of who the market is and how they are being served. That has changed in the last year or so, and I am sure we are going to get much better data in the next year or two. For right now, we are kind of "flying by the seat of our pants," and I think that you as legislators need to use common sense and decide whether the issues that we are discussing are good issues or bad issues.

Household, just so you know, and to greatly oversimplify, we think that any adult in America ought to be able to get credit if he can find somebody to lend him the money, but at the same time, we recognize that we as lenders have a responsibility to be sure that our borrowers completely understand what it is that they are doing and that they completely understand the transaction. In some cases, we also accept a responsibility to make decisions

I say that all as a lead-in. I am pleased to be able to support A.B. 284 because I think it makes a real effort to strike a good balance between common sense, what is good for the customer, and not eliminating very many people from the marketplace, or companies from being able to operate, if they operate in a legitimate manner. I am here primarily as a resource witness. I would be happy to answer any questions about any of the issues in this bill or what is going on around the country.

## Chairman Goldwater:

Only one small editorial comment and probably more of a sale for my own piece of legislation. On Section 6, where you define lender, I think that where we define it, and who is actually going to be served as having committed this, is going to be a difficult task. Nevada has a regulatory structure to make sure that point of contact, compared with the underwriter, compared with the mortgage brokerage company, and the mortgage agent, all need to be understood as part of this process. When we say that we are going to fix it, depending on where along the line we fix it, we are going to have to rely on a certain regulatory structure to make sure it does not pop up some place else, and that we have some place to make sure these things do not happen. So, under that definition in Section 6, along Nevada's line of regulatory framework, where do you see that happening? At the company level, at the underwriting level?

## Ken Scruggs:

I believe that the bill takes the approach that the person that actually makes the loan is responsible to see that the customer is given everything that he needs to have before the loan is closed. As it is currently written, it would also apply to whoever ultimately holds the note if the loan is sold out.

## Chairman Goldwater:

So, it does eventually get down to the underwriters, so all the way along the line. Do you agree, Gail?

## Gail Burks:

Yes.

## Assemblywoman Buckley:

There are some amendments coming. Even though we spent hours and hours last session working on the consensus bill, there were some change in lobbyists since then, so we had to do it again. Gail did a good bit of that. Some of the amendments we view as friendly, some of them we view as not so friendly, but we are going to get the whole group back together again and see if we can hammer them out. Gail, Mr. Scruggs, and those in the audience have pledged to do that. So that when you have a work session, you have one good document to work from.

## Chairman Goldwater:

I know that everyone on this Committee is a veteran member, or most of us are veteran members. We know that your consensus bills are usually long-drawn-out, hard-fought, consensus bills, and we will be mindful of that as we consider last-minute amendments. Is there anybody who would like to give their "me, too"?

## Melody Luetkehans, General Counsel, Nevada Association of Realtors:

We are here in support of this bill. Our members get affected when we get calls from people who want to list their properties that are trying to sell these homes, and they have no equity. Many times they are upside down.

# EXHIBIT 5

Assembly Bill No. 284 Assemblymen Buckley, Parks, Gibbons, Leslie, Horne, Anderson, Beers, Brown, Carpenter, Claborn, Collins, Conklin, Geddes, Giunchigliani, Goicoechea, Goldwater, Griffin, Hardy, Hettrick, Koivisto, Mabey, Manendo, McClain, Oceguera, Ohrenschall, Perkins, and Sherer

#### CHAPTER

AN ACT relating to property; prohibiting certain acts by lenders of home loans as unfair lending practices; providing for enforcement by the Attorney General; prohibiting a trustor from directing a trustee to exercise a power of sale of real property under certain circumstances; prohibiting certain agencies, boards, commissions or political subdivisions from regulating certain acts relating to lending; providing a penalty; and providing other matters properly relating thereto.

THE PEOPLE OF THE STATE OF NEVADA, REPRESENTED IN SENATE AND ASSEMBLY, DO ENACT AS FOLLOWS:

**Section 1.** Title 52 of NRS is hereby amended by adding thereto a new chapter to consist of the provisions set forth as sections 2 to 9, inclusive, of this act.

**Sec. 2.** *As used in this chapter, unless the context otherwise requires, the words and terms defined in sections 3 to 6, inclusive, of this act have the meanings ascribed to them in those sections.*

**Sec. 3.** *"Borrower" means a natural person who is a mortgagor, grantor of a deed of trust or other debtor of a home loan.*

**Sec. 4.** *"Home" means a dwelling or dwellings for not more than four families, the principal use of which is for residential purposes. The term includes, without limitation:*

*1. A dwelling on a farm.*

*2. A dwelling unit of a cooperative housing corporation.*

*3. A mobile home, as defined in NRS 489.120, with the wheels removed and skirting added, when set on a foundation located on land that the owner of the mobile home owns or occupies pursuant to a tenancy with a term of 40 years or more.*

**Sec. 5.** *"Home loan" means a consumer credit transaction that:*

*1. Is secured by a mortgage loan which involves real property located within this state; and*

*2. Constitutes a mortgage under § 152 of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1602(aa), and the regulations adopted by the Board of Governors of the Federal Reserve System pursuant thereto, including, without limitation, 12 C.F.R. § 226.32.*

Sec. 6. "Lender" means a mortgagee, beneficiary of a deed of trust or other creditor who holds a mortgage, deed of trust or other instrument that encumbers home property as security for the repayment of a home loan.

Sec. 7. 1. It is an unfair lending practice for a lender to:

(a) Require a borrower, as a condition of obtaining or maintaining a home loan secured by home property, to provide property insurance on improvements to home property in an amount that exceeds the reasonable replacement value of the improvements.

(b) Knowingly or intentionally make a home loan to a borrower based solely upon the equity of the borrower in the home property and without determining that the borrower has the ability to repay the home loan from other assets, including, without limitation, income.

(c) Finance a prepayment fee or penalty in connection with the refinancing by the original borrower of a home loan owned by the lender or an affiliate of the lender.

(d) Finance, directly or indirectly in connection with a home loan, any credit insurance.

2. As used in this section:

(a) "Credit insurance" has the meaning ascribed to it in NRS 690A.015.

(b) "Prepayment fee or penalty" means any fee or penalty imposed by a lender if a borrower repays the balance of a loan or otherwise makes a payment on a loan before the regularly scheduled time for repayment.

Sec. 8. 1. A lender who willfully engages in an unfair lending practice described in this chapter is guilty of a misdemeanor.

2. If a lender willfully engages in any unfair lending practice described in this chapter in connection with a home loan, the lender is liable to the borrower in an amount equal to the sum of:

(a) Three times the amount of any actual damages sustained by the borrower; and

(b) If the borrower brings an action and is successful in enforcing the liability imposed by paragraph (a) in the action, the costs of bringing the action and reasonable attorney's fees as determined by the court.

3. The borrower has a defense against the unpaid obligation of the home loan to the extent of any amount awarded by a court pursuant to paragraph (a) of subsection 2, and the court, in addition to any other legal or equitable remedy, may cure any existing default of the home loan and cancel any pending foreclosure sale, trustee's sale or other sale to enforce the home loan.

Sec. 8.3.  1.  If an action has been filed in a court of competent jurisdiction claiming an unfair lending practice in connection with a home loan, the lender who holds the home loan may sell the home loan and recover damages and costs as provided in this section if the lender did not:

(a) Originate the home loan; and

(b) Willfully engage in any unfair lending practice described in this chapter in connection with the home loan.

2.  The lender described in subsection 1 may require the person from whom the lender purchased the home loan described in subsection 1 to:

(a) Repurchase the home loan for the amount the lender paid for the home loan; and

(b) Pay to the lender all damages and reasonable costs incurred by the lender that are related to:

(1) The purchase of the home loan by the lender from the person;

(2) Any damages awarded in the action described in subsection 1;

(3) Any costs related to the action described in subsection 1;

(4) The repurchase of the home loan by the lender if the lender was required to repurchase the home loan from another lender pursuant to this section; and

(5) The repurchase of the home loan from the lender by the person pursuant to this section.

3.  The person described in subsection 2:

(a) Shall repurchase the home loan and pay the damages and costs as described in subsection 2; and

(b) After repurchasing the home loan, may sell the home loan and recover damages and costs as provided in this section if he is a lender described in subsection 1.

Sec. 8.7.  A mortgage, deed of trust or other instrument that encumbers home property as security for repayment of a home loan must expressly indicate in writing to the mortgage, deed of trust or other instrument that the home loan is a home loan as defined in section 5 of this act.

Sec. 9.  1.  The Attorney General has primary jurisdiction to investigate and prosecute violations of this chapter.

2.  When acting pursuant to this section, the Attorney General may commence his investigation and file a criminal action without leave of court, and he has exclusive charge of the conduct of the prosecution.

3.  A local government shall not regulate any activity to which the provisions of this chapter apply.

1

Sec. 10.   Chapter 107 of NRS is hereby amended by adding thereto a new section to read as follows:

*1.   With regard to a transfer in trust of an estate in real property to secure the performance of an obligation or the payment of a debt, the provisions of this section apply to the exercise of a power of sale pursuant to NRS 107.080 only if:*

*(a) The trust agreement becomes effective on or after October 1, 2003; and*

*(b) On the date the trust agreement is made, the trust agreement is subject to the provisions of § 152 of the Home Ownership and Equity Protection Act of 1994, 15 U.S.C. § 1602(aa), and the regulations adopted by the Board of Governors of the Federal Reserve System pursuant thereto, including, without limitation, 12 C.F.R. § 226.32.*

*2.   The trustee shall not exercise a power of sale pursuant to NRS 107.080 unless:*

*(a) In the manner required by subsection 3, not later than 60 days before the date of the sale, the trustee causes to be served upon the grantor a notice in the form described in subsection 3; and*

*(b) If an action is filed in a court of competent jurisdiction claiming an unfair lending practice in connection with the trust agreement, the date of the sale is not less than 30 days after the date the most recent such action is filed.*

*3.   The notice described in subsection 2 must be:*

*(a) Served upon the grantor by personal service or, if personal service cannot be timely effected, in such other manner as a court determines is reasonably calculated to afford notice to the grantor; and*

*(b) In substantially the following form, with the applicable telephone numbers and mailing addresses provided on the notice and a copy of the promissory note attached to the notice:*

### NOTICE
### YOU ARE IN DANGER OF LOSING YOUR HOME!

*Your home loan is being foreclosed. In 60 days your home will be sold and you will be forced to move. For help, call:*
*Consumer Credit Counseling* _____
*The Attorney General* _____
*The Division of Financial Institutions* _____
*Legal Services* _____
*Your Lender* _____
*Nevada Fair Housing Center* _____

*4.   This section does not prohibit a judicial foreclosure.*

Case 2:10-cv-01551-PMP-PAL   Document 28   Filed 10/26/10   Page 52 of 62

5.  *As used in this section, "unfair lending practice" means an unfair lending practice described in sections 2 to 9, inclusive, of this act.*

Sec. 11.   NRS 107.080 is hereby amended to read as follows:

107.080   1   [Where] *Except as otherwise provided in section 10 of this act, if* any transfer in trust of any estate in real property is made after March 29, 1927, to secure the performance of an obligation or the payment of any debt, a power of sale is hereby conferred upon the trustee to be exercised after a breach of the obligation for which the transfer is security

2   The power of sale must not be exercised, however, until
(a) In the case of any trust agreement coming into force

(1) On or after July 1, 1949, and before July 1, 1957, the grantor, or his successor in interest, a beneficiary under a subordinate deed of trust or any other person who has a subordinate lien or encumbrance of record on the property, has for a period of 15 days, computed as prescribed in subsection 3, failed to make good the deficiency in performance or payment, or

(2) On or after July 1, 1957, the grantor, or his successor in interest, a beneficiary under a subordinate deed of trust or any other person who has a subordinate lien or encumbrance of record on the property, has for a period of 35 days, computed as prescribed in subsection 3, failed to make good the deficiency in performance or payment.

(b) The beneficiary, the successor in interest of the beneficiary or the trustee first executes and causes to be recorded in the office of the recorder of the county wherein the trust property, or some part thereof, is situated a notice of the breach and of his election to sell or cause to be sold the property to satisfy the obligation, and

(c) Not less than 3 months have elapsed after the recording of the notice

3   The 15 or 35-day period provided in paragraph (a) of subsection 2 commences on the first day following the day upon which the notice of default and election to sell is recorded in the office of the county recorder of the county in which the property is located and a copy of the notice of default and election to sell is mailed by registered or certified mail, return receipt requested and with postage prepaid to the grantor, and to the person who holds the title of record on the date the notice of default and election to sell is recorded, at their respective addresses, if known, otherwise to the address of the trust property. The notice of default and election to sell must describe the deficiency in performance or payment and may contain a notice of intent to declare the entire unpaid balance due if acceleration is permitted by the obligation secured by the deed of trust, but acceleration must not occur if the deficiency in performance or payment is made good and any costs, fees and

Case 2:10-cv-01551-PMP-PAL   Document 28   Filed 10/26/10   Page 53 of 62

6

expenses incident to the preparation or recordation of the notice and incident to the making good of the deficiency in performance or payment are paid within the time specified in subsection 2.

4. The trustee, or other person authorized to make the sale under the terms of the trust deed or transfer in trust, shall, after expiration of the 3-month period following the recording of the notice of breach and election to sell, and before the making of the sale, give notice of the time and place thereof in the manner and for a time not less than that required by law for the sale or sales of real property upon execution. The sale itself may be made at the office of the trustee, if the notice so provides, whether the property so conveyed in trust is located within the same county as the office of the trustee or not.

5. Every sale made under the provisions of this section and other sections of this chapter vests in the purchaser the title of the grantor and his successors in interest without equity or right of redemption. The sale of a lease of a dwelling unit of a cooperative housing corporation vests in the purchaser title to the shares in the corporation which accompany the lease.

Sec. 12.   NRS 244.335 is hereby amended to read as follows:

244.335   1.   Except as otherwise provided in subsection 2, the board of county commissioners may:

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all character of lawful trades, callings, industries, occupations, professions and business conducted in its county outside of the limits of incorporated cities and towns.

(b) Except as otherwise provided in NRS 244.3359 and 576.128 fix, impose and collect a license tax for revenue or for regulation, or for both revenue and regulation, on such trades, callings, industries, occupations, professions and business.

2.   The county license boards have the exclusive power in their respective counties to regulate entertainers employed by an entertainment by referral service and the business of conducting a dancing hall, escort service, entertainment by referral service or gambling game or device permitted by law, outside of an incorporated city. The county license boards may fix, impose and collect license taxes for revenue or for regulation, or for both revenue and regulation, on such employment and businesses.

3.   No license to engage in any type of business may be granted unless the applicant for the license signs an affidavit affirming that the business has complied with the provisions of chapter 364A of NRS. The county license board shall provide upon request an application for a business license pursuant to chapter 364A of NRS.

4.   No license to engage in business as a seller of tangible personal property may be granted unless the applicant for the license presents written evidence that:

(a) The Department of Taxation has issued or will issue a permit for this activity, and this evidence clearly identifies the business by name, or

(b) Another regulatory agency of the State has issued or will issue a license required for this activity.

5. Any license tax levied for the purposes of NRS 244.3358 or 244A.597 to 244A.655, inclusive, constitutes a lien upon the real and personal property of the business upon which the tax was levied until the tax is paid. The lien has the same priority as a lien for general taxes. The lien must be enforced in the following manner:

(a) By recording in the office of the county recorder, within 6 months after the date on which the tax became delinquent or was otherwise determined to be due and owing, a notice of the tax lien containing the following:

(1) The amount of tax due and the appropriate year;

(2) The name of the record owner of the property;

(3) A description of the property sufficient for identification; and

(4) A verification by the oath of any member of the board of county commissioners or the county fair and recreation board; and

(b) By an action for foreclosure against the property in the same manner as an action for foreclosure of any other lien, commenced within 2 years after the date of recording of the notice of the tax lien, and accompanied by appropriate notice to other lienholders.

6. The board of county commissioners may delegate the authority to enforce liens from taxes levied for the purposes of NRS 244A.597 to 244A.655, inclusive, to the county fair and recreation board. If the authority is so delegated, the board of county commissioners shall revoke or suspend the license of a business upon certification by the county fair and recreation board that the license tax has become delinquent, and shall not reinstate the license until the tax is paid. Except as otherwise provided in NRS 244.3357, all information concerning license taxes levied by an ordinance authorized by this section or other information concerning the business affairs or operation of any licensee obtained as a result of the payment of such license taxes or as the result of any audit or examination of the books by any authorized employee of a county fair and recreation board of the county for any license tax levied for the purpose of NRS 244A.597 to 244A.655, inclusive, is confidential and must not be disclosed by any member, officer or employee of the county fair and recreation board or the county imposing the license tax unless the disclosure is authorized by the affirmative action of a majority of the members of the appropriate county fair and recreation board. Continuing disclosure may be so authorized under an agreement with the Department of Taxation for the exchange of information concerning taxpayers.

Sec. 13. NRS 266 355 is hereby amended to read as follows
266 355   1   Except as otherwise provided in subsection 3, the
city council may

(a) [Regulate] *Except as otherwise provided in section 9 of this
act, regulate* all businesses, trades and professions

(b) Except as otherwise provided in NRS 576 128, fix, impose
and collect a license tax for revenue upon all businesses, trades and
professions

2.   The city council may establish any equitable standard to be
used in fixing license taxes required to be collected pursuant to this
section

3   The city council may license insurance agents, brokers,
analysts, adjusters and managing general agents within the
limitations and under the conditions prescribed in NRS 680B 020

Sec. 14.   NRS 269 170 is hereby amended to read as follows
269 170   1   Except as otherwise provided in NRS 576 128 [ ]
*and section 9 of this act*, the town board or board of county
commissioners may in any unincorporated town

(a) Fix and collect a license tax on, and regulate  having due
regard to the amount of business done by each person so licensed
and all places of business and amusement so licensed, as follows

(1) Artisans, artists, assayers, auctioneers, bakers, banks and
bankers, barbers, boilermakers, cellars and places where soft drinks
are kept or sold, clothes cleaners, foundries, laundries, lumberyards,
manufacturers of soap, soda, borax or glue, markets, newspaper
publishers, pawnbrokers, funeral directors and wood and coal
dealers

(2) Bootmakers,   cobblers,   dressmakers,   milliners,
shoemakers and tailors

(3) Boardinghouses, hotels, lodginghouses, restaurants and
refreshment saloons

(4) Barrooms, gaming, manufacturers of liquors and other
beverages, and saloons

(5) Billiard tables, bowling alleys, caravans, circuses,
concerts and other exhibitions, dance houses, melodeons,
menageries, shooting galleries, skating rinks and theaters

(6) Corrals, hay yards, livery and sale stables and wagon
yards

(7) Electric light companies, illuminating gas companies
power companies, telegraph companies, telephone companies and
water companies

(8) Carts, drays, express companies, freight companies, job
wagons, omnibuses and stages

(9) Brokers, commission merchants, factors, general agents,
mercantile agents, merchants, traders and stockbrokers

(10) Drummers, hawkers, peddlers and solicitors

9

(11) Insurance agents, brokers, analysts, adjusters and managing general agents within the limitations and under the conditions prescribed in NRS 680B.020.

(b) Fix and collect a license tax upon all professions, trades or business within the town not specified in paragraph (a).

2. No license to engage in business as a seller of tangible personal property may be granted unless the applicant for the license presents written evidence that:

(a) The Department of Taxation has issued or will issue a permit for this activity, and this evidence clearly identifies the business by name, or

(b) Another regulatory agency of the State has issued or will issue a license required for this activity.

3. Any license tax levied for the purposes of NRS 244A.597 to 244A.655, inclusive, constitutes a lien upon the real and personal property of the business upon which the tax was levied until the tax is paid. The lien must be enforced in the same manner as liens for ad valorem taxes on real and personal property. The town board or other governing body of the unincorporated town may delegate the power to enforce such liens to the county fair and recreation board.

4. The governing body of the county fair and recreation board may agree with the Department of Taxation for the continuing exchange of information concerning taxpayers.

Sec. 15.  Section 2.140 of the Charter of the City of Caliente, being chapter 31, Statutes of Nevada 1971, at page 60, is hereby amended to read as follows:

Sec. 2.140  Powers of City Council: Licensing, regulation and prohibition of businesses, trades and professions.

1.  The City Council may:

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all businesses, trades and professions.

(b) Fix, impose and collect a license tax for revenue upon all businesses, trades and professions.

2.  The City Council may establish any equitable standard to be used in fixing license taxes required to be collected pursuant to this section.

Sec. 16.  Section 2.150 of the Charter of the City of Caliente, being chapter 344, Statutes of Nevada 1971, at page 608, is hereby amended to read as follows:

Sec. 2.150  Powers of Board of Councilmen: Licensing, regulation and prohibition of businesses, trades and professions.

1.  The Board of Councilmen may:

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all businesses, trades and professions.

(b) Fix, impose and collect a license tax for revenue upon all businesses, trades and professions.

2. No person licensed by an agency of the State of Nevada to practice any trade or profession except gaming may be denied a license to conduct his profession.

3. The Board of Councilmen may establish any equitable standard to be used in fixing license taxes required to be collected pursuant to this section.

Sec. 17. Section 2.260 of the Charter of the City of Carson City, being chapter 213, Statutes of Nevada 1969, as amended by chapter 96, Statutes of Nevada 1997, at page 181, is hereby amended to read as follows:

Sec. 2.260 Power of Board: Licensing, regulation and prohibition of trades, professions and businesses.

1. [The] *Except as otherwise provided in section 9 of this act, the* Board may fix, impose and collect a license tax for revenue upon, or regulate:

(a) Or both, all trades, callings, professions and businesses, conducted in whole or in part within Carson City, except that no person licensed by an agency of the State of Nevada to practice any profession except gaming may be denied a license to conduct his profession or required to pay a license tax except for revenue.

(b) Or both, all businesses selling alcoholic liquors at wholesale or retail, or prohibit or suppress such businesses.

(c) Or prescribe the location of all gaming establishments, or any combination of these, or may prohibit gambling and gaming of all kinds, and all games of chance.

2. The Board may provide for the issuance of all licenses authorized in this section and the time and manner in which they will be issued.

3. The Board may establish any equitable standard to be used in fixing license taxes required to be collected pursuant to this section.

4. The Board may, for just cause, suspend, cancel or revoke any business license.

Sec. 18. Section 2.150 of the Charter of the City of Elko, being chapter 276, Statutes of Nevada 1971, as amended by chapter 51, Statutes of Nevada 2001, at page 454, is hereby amended to read as follows:

Sec. 2.150 Powers of City Council: Licensing, regulation and prohibition of businesses, trades and professions.

1. The City Council may:

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all businesses, trades and professions.

(b) Fix, impose and collect a license tax for revenue upon all businesses, trades and professions

2. The City Council may establish any equitable standard to be used in fixing license taxes collected pursuant to this section

Sec. 19.  Section 2 130 of the Charter of the City of Henderson, being chapter 266, Statutes of Nevada 1971, at page 407, is hereby amended to read as follows

Sec 2 130  Powers  of  City  Council  Licensing, regulation  and  prohibition  of  businesses,  trades  and professions

1. The City Council may

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all businesses, trades and professions

(b) Fix, impose and collect a license tax for revenue upon all businesses, trades and professions

2. The City Council may establish any equitable standard to be used in fixing license taxes required to be collected pursuant to this section

Sec. 20.  Section 2 150 of the Charter of the City of Las Vegas, being chapter 517 Statutes of Nevada 1983 at page 1398, is hereby amended to read as follows

Sec 2 150  Powers  of  City  Council  Licensing, regulation  and  prohibition  of  businesses,  trades  and professions

1. The City Council may

(a) Except as is otherwise provided in subsection 2 [ ] *and section 9 of this act,* license and regulate all lawful businesses, trades and professions

(b) Fix, impose and collect a license tax for regulation or for revenue, or both, upon all businesses, trades and professions and provide an equitable standard for fixing those license taxes

(c) Suspend or revoke the license of any business, trade or profession for failing to comply with any regulation of the City in such manner as may be prescribed by ordinance

2. No person, firm or corporation which is licensed by an agency of the State to conduct or practice any business, trade or profession, except as is otherwise provided in subsection 3, may be denied a license to conduct or practice that business, trade or profession, nor may the license be suspended or revoked, if

(a) That person, firm or corporation complies with all of the regulations which are established by that agency and pays to the City such license taxes and related fees and posts such bond or bonds as may be prescribed by ordinance, and

(b) The location of the business, trade or profession complies with all of the requirements of all of the zoning, building, plumbing, electrical, safety and fire prevention codes or regulations of the City.

3. The City Council may provide, by ordinance, regulations which restrict the number, location and method of operation of and the qualifications for ownership in:

(a) Liquor-dispensing or gaming establishments, or both;

(b) Businesses which are engaged in the manufacture or distribution, or both, of liquor or gaming devices; and

(c) Such other businesses, trades and professions as may be declared by ordinance to be privileged,

and regulations which prescribe the circumstances under and the manner in which licenses with respect to those establishments, businesses, trades and professions may be denied, limited, suspended or revoked.

**Sec. 21.** Section 2.140 of the Charter of the City of North Las Vegas, being chapter 573, Statutes of Nevada 1971, at page 1215, is hereby amended to read as follows:

Sec. 2.140 Powers of City Council: Licensing, regulation and prohibition of businesses, trades and professions.

1. The City Council may:

(a) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* all businesses, trades and professions.

(b) Fix, impose and collect a license fee for revenue upon all businesses, trades and professions.

2. The City Council may establish any equitable standard to be used in fixing license fees required to be collected pursuant to this section.

**Sec. 22.** Section 2.140 of the Charter of the City of Reno, being chapter 662, Statutes of Nevada 1971, as last amended by chapter 416, Statutes of Nevada 2003, at page 2105, is hereby amended to read as follows:

Sec. 2.140 General powers of City Council.

1. Except as otherwise provided in subsection 2 and section 2.150, the City Council may:

(a) Acquire, control, improve and dispose of any real or personal property for the use of the City, its residents and visitors.

(b) [Regulate] *Except as otherwise provided in section 9 of this act, regulate* and impose a license tax for revenue upon all businesses, trades and professions.

(c) Provide or grant franchises for public transportation and utilities.

(d) Appropriate money for advertising and publicity and for the support of a municipal band

(e) Enact and enforce any police, fire, traffic, health, sanitary or other measure which does not conflict with the general laws of the State of Nevada. An offense that is made a misdemeanor by the laws of the State of Nevada shall also be deemed to be a misdemeanor against the City whenever the offense is committed within the City

(f) Fix the rate to be paid for any utility service provided by the City as a public enterprise. Any charges due for services, facilities or commodities furnished by any utility owned by the City is a lien upon the property to which the service is rendered and is perfected by filing with the County Recorder a statement by the City Clerk of the amount due and unpaid and describing the property subject to the lien. Any such lien is

(1) Coequal with the latest lien upon the property to secure the payment of general taxes

(2) Not subject to extinguishment by the sale of any property on account of the nonpayment of general taxes

(3) Prior and superior to all liens, claims, encumbrances and titles other than the liens of assessments and general taxes

2   The City Council

(a) Shall not sell telecommunications service to the general public

(b) May purchase or construct facilities for providing telecommunications that intersect with public rights of way if the governing body

(1) Conducts a study to evaluate the costs and benefits associated with purchasing or constructing the facilities, and

(2) Determines from the results of the study that the purchase or construction is in the interest of the general public

3   Any information relating to the study conducted pursuant to subsection 2 must be maintained by the City Clerk and made available for public inspection during the business hours of the Office of the City Clerk

4   Notwithstanding the provisions of paragraph (a) of subsection 2, an airport may sell telecommunications service to the general public

5   As used in this section

(a) "Telecommunications" has the meaning ascribed to it in 47 U.S.C. § 153(43), as that section existed on July 16, 1997

(b) "Telecommunications service" has the meaning
ascribed to it in 47 U S C § 153(46), as that section existed
on July 16, 1997

Sec. 23. Section 2.090 of the Charter of the City of Sparks,
being chapter 470, Statutes of Nevada 1975, as last amended by
chapter 129. Statutes of Nevada 1993, at page 230 is hereby
amended to read as follows

Sec 2.090 Powers of City Council General areas
The City Council may exercise any power specifically
granted in this Charter or by any of the provisions of Nevada
Revised Statutes not in conflict with this Charter in order to

1 [License] *Except as otherwise provided in section 9
of this act, license* all businesses, trades and professions for
purposes of regulation and revenue

2 Enact and enforce fire ordinances

3 Regulate the construction and maintenance of any
building or other structure within the City

4 Provide for safeguarding of public health in the City

5 Zone and plan the City, including the regulation of
subdivision of land, as prescribed by chapter 278 of NRS

6 Acquire, control, lease dedicate, sell and convey
rights of way, parks and other real property

7 Regulate vehicular traffic and parking of vehicles

8 Establish and maintain a sanitary sewer system

9 Condemn property within the territorial limits of the
City, as well as property outside the territorial limits of the
City, in the manner prescribed by chapter 37 of NRS

10 Regulate, prescribe the location for, prohibit or
suppress all businesses selling alcoholic liquors at wholesale
or retail

11 Regulate, prescribe the location for, prohibit or
suppress gaming of all kinds

Sec. 24. Section 2.150 of the Charter of the City of Wells,
being chapter 275, Statutes of Nevada 1971, at page 463 is hereby
amended to read as follows

Sec 2.150 Powers of Board of Councilmen Licensing,
regulation and prohibition of businesses trades and
professions

1 The Board of Councilmen may

(a) [Regulate] *Except as otherwise provided in section 9
of this act, regulate* all businesses, trades and professions

(b) Fix, impose and collect a license tax for revenue upon
all businesses, trades and professions

2 No person licensed by an agency of the State of
Nevada to practice any trade or profession except gaming
may be denied a license to conduct his profession

ᵉᶠᶠᵒʳ easeг easinceわ